Joseph KENT, Plaintiff,

v.

The State of IOWA, Newton Correctional Facility, Terry Mapes (in his individual capacity), Kris Weitzell (in her individual capacity), Troy White (in his individual capacity), Carol Van Gorp (in her individual capacity), Jeff Panknen (in his individual capacity), Cindy Conn (in her individual capacity), Larry Lipscomb (in his individual capacity), Carol Boggess (in her individual capacity), Des Moines Area Community College Foundation d/b/a Des Moines Area Community College, Jill Klubek, and Sherri Reynolds, Defendants.

James D. Davis, Plaintiff,

v.

The State of Iowa, Newton Correctional Facility, Terry Mapes (in his individual capacity), Kris Weitzell (in her individual capacity), Troy White (in his individual capacity), Carol Van Gorp (in her individual capacity), Larry Lipscomb (in his individual capacity), Scott Miller (in his individual capacity), Cindy Conn (in her individual capacity), Carol Boggess (in her individual capacity), Des Moines Area Community College Foundation d/b/a Des Moines Area Community College, Jill Klubek, and Sherri Reynolds, Defendants.

Marty Marvin Marsh, Plaintiff,

v.

The State of Iowa, Newton Correctional Facility, Kris Weitzell (in her individual capacity), Troy White (in his individual capacity), Carol Van Gorp (in her individual capacity), Cindy Conn (in her individual capacity), Carol Boggess (in her individual capacity), Des Moines Area Community College Foundation d/b/a Des Moines Area Community College, Jill Klubek, and Sherri Reynolds, Defendants.

Nos. 4:06–cv–00402, 4:06–cv–00582, 4:06–cv–00592.

United States District Court, S.D. Iowa, Central Division.

Sept. 10, 2009.

921

Bruce H. Stoltze, Eric M. Updegraff, Stoltze & Updegraff PC, Des Moines, IA, for Plaintiffs.

Forrest A. Guddall, Department of Justice, Mark Hunacek, Iowa Attorney General, Randall H. Stefani, Danielle Jess Haindfield, Nicholas A. Klinefeldt, Ahlers & Cooney, P.C., Des Moines, IA, for Defendants.

1. The DMACC Defendants' Reply consists only of a Reply to Plaintiffs' Statement of

ROBERT W. PRATT, Chief Judge.

Before the Court are two motions, filed by Defendants in the above-captioned actions. On May 14, 2009, Des Moines Area Community College Foundation d/b/a Des Moines Area Community College ("DMACC"), Jill Klubek ("Klubek"), and Sherri Reynolds ("Reynolds") (collectively "DMACC Defendants") filed a Motion for Summary Judgment. Clerk's No. 52. On May 15, 2009, the State of Iowa, Newton Correctional Facility ("NCF"), Kris Weitzell ("Weitzell"), Troy White ("White"), Carol Van Gorp ("Van Gorp"), Cindy Conn ("Conn"), Carol Boggess ("Boggess"), Terry Mapes ("Mapes"), Larry Lipscomb ("Lipscomb"), and Scott Miller ("Scott Miller") (collectively "State Defendants") filed a Motion for Summary Judgment. Clerk's No. 53. Plaintiffs Joseph Kent, James Davis, and Marty Marsh (collectively "Plaintiffs") filed resistances to both Motions for Summary Judgment on June 15, 2009. Clerk's Nos. 60, 62, 65, 66. The DMACC Defendants filed a Reply on June 23, 2009.[1] Clerk's No. 69. The State Defendants filed a Reply on July 6, 2009. Clerk's No. 71. While the State Defendants have requested oral argument, the Court does not believe oral argument will substantially aid it in resolving the present issues. Accordingly, the matters are fully submitted.

I. PROCEDURAL BACKGROUND

Plaintiff Joseph Kent ("Kent") filed a Complaint against the State Defendants and the DMACC Defendants on August 22, 2006. Case No. 4:06–cv–00402 ("Kent Case"), Clerk's No. 1. Plaintiff James Davis ("Davis") filed a Complaint against the State Defendants and the DMACC Defendants on December 7, 2006. Case No. 4:06–cv–00582 ("Davis Case"), Clerk's No. 1. Plaintiff Marty Marsh ("Marsh")

Additional Facts, without any additional briefing.

filed a Complaint against the State Defendants and the DMACC Defendants on December 14, 2006. Case No. 4:06–cv–00592 ("Marsh Case"), Clerk's No. 1. All three Complaints[2] assert the following causes of action: 1) Gender Discrimination, in violation of Title VII and the Iowa Civil Rights Act ("ICRA")[3]; 2) Denial of Equal Protection under 42 U.S.C. § 1983 and the Iowa Constitution[4]; 3) Slander[5]; and 4) Intentional Interference with a Contract.[6] Kent additionally asserts a claim for Disability Discrimination, in violation of the ICRA.[7]

In early August 2007, the DMACC Defendants filed unresisted Motions to Consolidate in all three cases. Kent Case, Clerk's No. 34; Davis Case, Clerk's No. 34; Marsh Case, Clerk's No. 28. Chief Magistrate Judge Thomas Shields granted the motions on September 5, 2007. Kent Case, Clerk's No. 36; Davis Case, Clerk's No. 37; Marsh Case, Clerk's No. 30. The cases were consolidated for all purposes, including trial, and the Kent Case was designated the lead case.

## II. FACTUAL BACKGROUND

At all times relevant to this action, Plaintiffs were employees of the Iowa Department of Corrections ("IDOC"), working at NCF. State Defs.' Statement of Undisputed Facts (hereinafter "State Defs.' Facts") ¶ 1. Plaintiffs Kent and Davis are correctional counselors at NCF, while Plaintiff Marsh is a psychologist. DMACC Defs.' Statement of Undisputed Material Facts (hereinafter "DMACC Defs.' Facts") ¶¶ 1–3.[8] Defendant Mapes

---

2. Not all of the State Defendants are named in all of the Plaintiffs' Complaints. Mapes and Lipscomb are only named as defendants in the Kent and Davis Complaints. Panknen is only a named defendant in the Kent Complaint. Scott Miller is only a named defendant in the Davis Complaint.

3. All three Plaintiffs assert their Title VII Gender Discrimination claim against the State of Iowa and NCF. They assert their ICRA Gender Discrimination claim against the State of Iowa, NCF, Van Gorp, Boggess, Weitzell, and White. Kent and Davis also assert the ICRA claim against Lipscomb and Mapes, and Davis additionally alleges the ICRA claim against Scott Miller.

4. All three Plaintiffs assert their Equal Protection claims against Van Gorp, Boggess, Weitzell, and White. Kent and Davis also assert their Equal Protection claims against Lipscomb and Mapes, and Davis additionally alleges his claim against Scott Miller.

5. Kent captions his Slander claim as "Slander," while Davis and Marsh caption their claims as "Slander Per Se." All three Plaintiffs assert the claim against Weitzell, Klubek, Conn, and Reynolds. Davis and Marsh also allege liability against DMACC. The Court notes that Marsh's Complaint numbers the claim as Count IV, but that it is only the third cause of action listed therein.

6. All three Plaintiffs assert the Intentional Interference with a Contract claim against DMACC, Weitzell, Klubek, Conn, and Reynolds. The Court notes that both Kent and Marsh have numbered this claim Count VIII, despite the fact that it is the fifth claim in Kent's Complaint and the fourth claim in Marsh's Complaint.

7. Kent asserts his Disability Discrimination claim under the ICRA against the State of Iowa, NCF, Van Gorp, Panknen, Mapes, and Weitzell.

8. In Plaintiffs' Response to DMACC Defendants' Statement of Undisputed Material Facts, Plaintiffs deny the allegations in paragraphs 1–3 that Kent and Davis are correctional counselors and that Marsh is a psychologist, despite the fact that the assertions are well supported by references to the record. Plaintiffs' responses in this regard, however, do not appear to correspond to the asserted facts. See Pls.' Response to DMACC Defs.' Facts ¶¶ 1–3 (denying the assertions regarding the position each Plaintiff held at NCF and stating "Warden Terry Mapes suspended [Plaintiffs].... Each of the Plaintiffs served their suspension.... The significant delay in each of the Plaintiffs receiving their pay affected the terms and conditions of their employment.").

is the warden of NCF. State Defs.' Facts ¶ 1. At the time of the events giving rise to Plaintiffs' claims, Klubek was an adjunct instructor at DMACC who taught life skills to NCF inmates through a grant. DMACC Defs.' Facts ¶ 4. Reynolds, another DMACC employee, was Klubek's supervisor. State Defs.' Facts ¶ 2.

In May 2005, the Iowa Corrections Training Center ("ICTC") held training for Offender Workforce Development specialists. *Id.* During the ICTC training, concerns were raised about whether Klubek, one of the participants, should continue to work at NCF. *Id.* Laura Scheffert–James ("Scheffert–James"), an IDOC employee, met with Klubek, Reynolds, and others to discuss Klubek's attitude and demeanor during the training. *Id.* At the meeting, Klubek acknowledged that she had a negative attitude. *Id.* Klubek then made some statements about incidents at NCF that prompted Scheffert–James to write the following e-mail to Warden Mapes:

> The final week of a 3–week training for Offender Workforce Development Specialists was conducted at the [ICTC] on May 2–6, 2005. Jill Klubek, a Life Skills Specialist for DMACC who works at [NCF] was one of the participants in the training. Ms. Klubek has not completed practicum assignments prior to the training as was the expectation (even after having been granted an extension) nor did Ms. Klubek acknowledge she had not completed the assignments when she reported to training for this final week. This is unacceptable and reason to consider her termination from the program. It was then brought to my attention that Ms. Klubek was displaying what was perceived by the trainers and the NIC Corrections Program Specialist as a negative attitude that was counterproductive and distracting for other participants. This was monitored for a couple of days and on Day # 3,

May 4, 2005, it was decided an intervention was necessary.

. . .

> Upon confronting Ms. Klubek with the observations of her negative behavior, she acknowledged she was indeed negative and it was decided it would be best for her to leave the program. When discussing her negative attitude, Ms. Klubek initially commented about the demeanor of the trainers and indicated she felt they were condescending and implied that contributed to her attitude. This writer further questioned Ms. Klubek as her attitude appeared to be so much more pervasive than what was supported by her comments about the trainers. Ms. Klubek then began to confide how she felt about the [IDOC] in general and about the [NCF] as she began to describe how difficult it was for her to work in that environment. Upon further discussion, Ms. Klubek became emotional and cried. She made a couple of comments that were particularly disturbing to this writer. She commented that we did not understand what it was like to work there (NCF) and began to comment about the staff and said, "I have had my desk searched". . . "I have been asked my bra size" . . . and made further comments about the sexual nature of conversations that took place in her office setting. When asked what staff she was referring to she said counselors and Psychologist. Ms. Reynolds then added that she herself had been in [Klubek's] office visiting when she too had overheard conversations that she should not have heard between Marty Marsh and staff as she knew it was a Peer Support person and worked with staff so there were often other staff in the office. Ms. Reynolds noted she overheard conversation re: a "sex chair" and something about various sexual positions. As this writer was unaware Ms.

Klubek was sharing an office, I asked more about that arrangement at which time, Ms. Reynolds indicated [Klubek] was supposed to be getting a different office, but that it had not happened yet and that they were waiting on something with regard to the computer. She then said that the person they needed to wait on was also a problem for [Klubek]. Further comments were made by Ms. Reynolds that the computer person, Brenda Miller, and the Educational Instructor were all difficulties for Ms. Klubek.

Ms. Klubek noted that she does not say anything about the comments made to her or around her, indicating it was easier to do that than to say something. Upon wrapping up our discussion, this writer informed Ms. Klubek that being asked her bra size and overhearing conversations of a sexual nature as was described were clearly inappropriate. This writer also asked who, if anyone, was aware of some of the issues and was informed that management at Newton was made aware of some of the issues, specifically, Larry Lipscomb. (This writer is not sure which pieces Mr. Lipscomb was actually aware). This writer then informed Ms. Klubek and Ms. Reynolds that I did not believe Ms. Klubek should be hearing the types of conversations she said she was hearing and informed her that if something was in the works to get her a separate office, I did not know why that could not happen soon and that I would follow up on that. It was decided Ms. Klubek would leave the OWDS training this date and Ms. Reynolds told her to take the rest of the week off and that she did not need to go back to that environment at Newton. This writer informed Ms. Reynolds that I would follow up re: the office space and hoped that when Ms. Klubek returned to work the following Monday (May 9) that will have been addressed.

The following day, May 5th, this writer spoke at length with Nancy Kucera re: the situation and attempted to contact Warden Mapes, but he was not in his office. Nancy Kucera made contacts on the following day and contacted me to inform the movement of Ms. Klubek's office was in the works so, I just needed to continue to try to reach Warden Mapes to inform. This writer did speak via telephone with Warden Mapes on or about May 15th and advised of the situation. Warden Mapes was very concerned and said he would follow up and asked that I follow up in writing with the information I had provided. This is my follow-up documentation.

State Defs.' App. at 1–2 (obvious typographical errors corrected). Warden Mapes forwarded Scheffert–James' e-mail, along with instructions to investigate the matter, to Scott Miller, the Security Director at NCF, approximately ten minutes after he received it. State Defs.' Facts ¶ 3. Scott Miller, in turn, sent an e-mail to his subordinate, White, instructing White to investigate. *Id.*

In June and July 2005, White conducted several interviews at NCF. State Defs.' App. at 4–62. At the commencement of each interview, White informed the interviewee that there was a "formal investigation" and requested that the interviewee be truthful and not discuss the matter further with anyone outside of the interview room. *See, e.g., id.* at 14, 32, 37. White's first interview was of Lipscomb, the Treatment Director for NCF. *Id.* at 41–46. Lipscomb related that Klubek had previously had conflicts with certain persons in the education department about classroom space, computer issues, and a "search" of her desk. *Id.* When asked about Klubek's allegations that she had been exposed to discussions of a sexual nature, the following exchange ensued:

Q. Ms. Reynolds, Jill Klubek's supervisor, says Marty Marsh and some staff had this sex chair conversation. She alleges she was in the room when this was taking place. You have any knowledge of that conversation?

A. Not that I can remember. Like I said that might have taken place and I wasn't around.

Q. Okay. Have you ever been in the room personally when this sexual conversation go on that you know Ms. Klubek was there also?

A. I may have been, well depending on what she's considering sexual.

Q. Okay.

A. I mean because we talk in general and ask you know kind of what you did on the weekend those kind of conversations but not specific in what she you know would be addressing.

Q. Well I guess all I have here it says sexual nature, her bra size, sexual chair and various positions, sexual positions those types of things.

A. Not that I'm aware of. Not that I can remember being around. . . .

Q. Okay. Has she come to you with any concern saying that she's been offended, she feels sexually harassed, anything like that?

A. No. This is a shock to me to tell you the truth.

*Id.* at 44–45.

White interviewed Klubek on June 28, 2005. *Id.* at 47–50E. Klubek discussed a situation where her desk had been searched by Julie Cline, but Klubek stated that the "situation is resolved." *Id.* at 47A. Klubek relayed a conflict she had with Brenda Miller ("Miller") regarding Klubek's attendance at various training sessions. *Id.* at 50A–50B.[9] Klubek also recounted conflicts she had with Lynn Slykhuis regarding a variety of issues. *Id.* at 50B–C ("[S]he doesn't talk to me. She turns me in to security. There's been issues with sharing the room. There was a huge issue in that computer lab that a bunch of miscommunication. The warden got so fed up he almost threw all of DMACC out. . . ."). Regarding Davis, Klubek stated: "[Davis] makes comments both to me and to Cindy [Conn] in general . . . he calls me Miss Jilly and he just flirts and he says things and sometimes it winds up turning into what's your bra size." *Id.* at 47B. Klubek also related hearing Davis and Marsh talking about the fact that Davis "was building a sexual positioning chair." *Id.* at 49. Klubek recounted that Davis "frequently" talked about the chair, that "it was an ongoing joke for a period of weeks," and that anybody who happened to be in the general office space would have heard talk of the sexual chair. *Id.* at 49 ("[Davis would] come in and talk about the progress on his chair . . . at various

9. Apparently, Miller asked Klubek to attend certain training sessions, but Klubek declined on the basis that the sessions did not work with her schedule. According to Klubek, Miller informed Warden Mapes, Nancy Kucera, and Sherri Reynolds that Klubek was uncooperative:

I don't even know what happened at that point because it was out of my hands. It was between the warden and Nancy Kucera and Sherri and who knows who else. All I know is that I got (inaudible) and I don't even know I don't think it went against my record at DMACC. . . . I got a memo [stating Miller's allegation] I was being uncooperative and that was fine and that was all that ever happened with it.

State Defs.' App. at 50A. Klubek also stated, however, that after this incident, "all of a sudden there was this barrage of other training that I had to go to." *Id.* at 50B.

times, various people were in there and I'm pretty sure there were a lot of people who knew he was building this chair."). Klubek further relayed that she heard Marsh and Kent "having a conversation about the top ten ways you can tell your girlfriend is retarded." *Id.* at 48. When Klubek told Marsh and Kent that she didn't think their jokes were funny, "they just laughed." *Id.* at 50. Klubek stated that she did not discuss any of the sexual conversations with Lipscomb: "I didn't want an investigation. I was just going to keep all of that to myself." *Id.* at 50E.

On June 29, 2005, White interviewed Conn, a treatment secretary that shared an office with Marsh and Klubek. *Id.* at 51–56. Conn stated that she did not recall ever hearing Davis ask Klubek her bra size or hearing Kent and Marsh discuss ways to tell if your girlfriend is retarded, but that she had overheard conversations between Davis and Marsh about a sex chair. *Id.* at 53–54. With regard to such conversations, Conn stated that she had heard Klubek say she didn't like them, but that Davis and Marsh "usually just kept doing it" and Klubek "would just usually leave." *Id.* Conn also stated that Davis, Marsh, and Kent "tease[d] [Klubek] all the time and you know they just make comments." *Id.* at 54. Conn was interviewed by White again on July 12, 2005. Pls.' App. in Supp. of Resistance to State Defs.' Motion for Summ. J. (hereinafter "Pls.' State App.") at 132–35. During that interview, Conn stated that Davis, Marsh, and Kent teased Klubek about inmates Klubek had in her class: "[T]hey would just make comments that you're never going to help inmates and you know once you're here after awhile you'll know that...." *Id.* at 132. Conn stated that Klubek told Plaintiffs to stop the teasing, but that they continued. *Id.* at 133. Additionally, the following exchange occurred during the interview:

Q. How about the sexual comments that you talk about? We talk about Jim Davis and Marty Marsh talking about the sexual things and stuff like that.

A. Yeah she did not want to hear that. She asked them not to.

Q. And they kept on correct?

A. Yeah.

Q. And you said at one time that ... she got up and left a couple time you could tell that she was angry you made a comment to at least Marty or maybe all of them or Marty that they needed to stop because she was going to get mad. Is that correct?

A. I did.

Q. And what did they say to you?

A. I don't remember what they said for sure. They would laugh about it.... You know they ... didn't quit. I mean they continued it you know.

Q. So they didn't so it'd go on the next day or?

A. Yeah.

Q. The next time or?

A. The next day or so yes they would do it again.

Q. And all of them Jim Davis, Marty Marsh, Joe Kent would be involved in these types of things.

A. Yes. If they were in the room they usually were talking about it yes.

*Id.* at 134.

White interviewed Reynolds on June 30, 2005. State Defs.' App. at 24–31. Reynolds stated that she had not personally heard anyone ask Klubek about her bra size, but that she was in the office several times when there were inappropriate conversations between Marsh and others:

A. There was an employee and I have no idea who he is come in to give Marty an update on their last treatment session or counseling session or whatever and he was updating him on the chair. I don't know whether he purchased it or designed it or whatever and how well it worked for him and his partner. I just really felt like conversations like that should not have happened in front of strangers.

Q. So you were in the room when this conversation happened? Who else was there?

A. Yeah. Jill and I were sitting ... at her desk ... I don't remember if Cindy was in there at that time or not.... Every single time I've come to visit Jill I've overheard conversations that I wish I did not.

Q. Was this, was it Marty Marsh and this same person?

A. No it was different people every time.

...

Q. Okay. Did you overhear any other conversations that were sexual in nature?

A. That's, that was, no. Stories that Marty shared were often times sexually [sic] had sexual information about him and his personal life that I think are inappropriate to share in the work place ... [i]t made me feel very uncomfortable to visit Jill in her office.

Q. Did anybody ever say to Marty they felt uncomfortable that you're aware of?

A. No.

*Id.* at 27. Reynolds never told Warden Mapes or Lipscomb about the sexual con-

versations, but she did emphasize to them that Klubek needed to be moved out of the office space she shared with Marsh and Conn. *Id.* at 27–28.

On July 7, 2005, White interviewed Kent. *See* State Defs.' App. at 4–9. Kent specifically denied hearing any conversations about any of the following: Klubek's bra size, a "sex chair," sexual misconduct outside NCF, and "the top ten list of how to tell if you[r] girlfriend was retarded or not." *Id.* Kent further denied ever hearing "any conversations regarding any sexual nature conversations in [Klubek's] office area" or seeing Klubek walk out of a room "mad." *Id.*

White also interviewed Marsh on July 7, 2005. *Id.* at 10–13B. Marsh denied ever asking or hearing anyone ask Klubek her bra size. *Id.* at 11. Marsh did, however, recall being present during a conversation wherein Davis discussed "building a couch that could be used for ... sexual positions." *Id.* Marsh stated that he did not recall participating in the conversation, and he does not think he did because "I know I wouldn't have done that." *Id.* at 12. Marsh did, however, admit to joking with Kent about "how do you know if your girlfriend is retarded or something like that," but he did not recall if Klubek was present during the conversation. *Id.* at 13. White conducted a second interview of Marsh on July 29, 2005. *Id.* at 71–94. During that interview, Marsh stated that he did recall a conversation between Conn and Davis about a bench that could be used for sexual positions, but that he was certain that Klubek "absolutely was not there" and that he, himself, did not ever say or discuss anything of a sexual nature in front of Klubek. *Id.* at 72, 82–87.

On July 12, 2005, White interviewed Activity Specialist Doug Talsma.[10] Talsma

---

10. White interviewed Chaplain Perry Stevens on the same date. State Defs.' App. at 32–40. Chaplain Stevens did not recall ever hearing any discussions of a sexual nature in the shared office space shared by Klubek, Conn, and Marsh. *Id.* at 38–40.

recounted hearing Davis discussing a sex chair in the shared office space. *Id.* at 34. He recalled Marsh being present "a couple of times when [Davis] talked about it," but does not recall if Marsh "said anything about it or not." *Id.* Talsma did not recall if Klubek was in the office on any occasion when Davis discussed a sex chair and stated that he never heard discussions about bra size or how to tell if your girlfriend is retarded. *Id.* at 34–35.

White interviewed Davis on July 6, 2005, and again on July 12, 2005. *Id.* at 14–23. In the first interview, Davis recalled discussing a "love bench ... love chair, love seats," but stated he could not recall if there were ever discussions of "sexual positions being performed in that chair." *Id.* at 15. He stated that he likely had conversations with Marsh of a sexual nature, but did not specifically recall ever having any such conversation around Klubek or anybody else. *Id.* In the second interview, Davis specifically denied asking Klubek her bra size, and stated that he could not recall ever discussing a "sex chair" or any such device in front of Klubek or any other female. *Id.* at 17–18. Davis recounted having some "lively discussions" with Klubek, but stated that the only time she ever left the room mad was after Klubek herself made a comment about "hating C/Os and hating police officers." *Id.* at 18–19.

The decision of what, if any, discipline to impose on an employee of NCF is the decision of the warden, although the warden may accept recommendations from his Executive Team.[11] State Defs.' Facts ¶ 5. According to Warden Mapes, at the conclusion of White's investigation, both he and his Executive Team were convinced

that the sexually related conversations alleged by Klubek against Kent, Davis, and Marsh had actually occurred. *Id.* Accordingly, on August 11, 2005, Kent was suspended for two days without pay, while Davis and Marsh were each suspended for five days without pay. State Defs.' App. at 57–60. The letters to Plaintiffs stated that each had been found in violation of NCF policy O.M. 3–7, which provides:

4. Except for scheduled breaks, employees will not engage in activities unrelated to their duties. They will avoid activities which interfere with the institution's functions, including but not limited to loafing, loitering, sleeping on duty, horseplay, conducting unauthorized personal business while on duty, excessive visiting while on duty, personal reading, writing, typing, personal phone calls or use of any office equipment for personal business. You are to avoid boisterous or inappropriate discussions and behavior, which would disrupt the work of others or the ability to conduct normal business.

24. Employees will treat other employees, offenders, guests, visitors and the public with respect, courtesy and fairness. In interchanges with staff, offenders and visitors, employees will maintain a quiet demeanor even under provocation. Employees are prohibited from using profane, indecent, abusive or insulting language and gestures toward an offender or staff. The use of profanity is discouraged.

---

**11.** The Executive Team is made up of the deputy warden, security director, business manager, and the personnel director. Pls.' Statement of Material Facts in Response to State Defs.' Mot. for Summ. J. (hereinafter "Pls.' State Facts") ¶ 1. It meets on issues and provides advice and counsel to the war-

den. *Id.* In disciplinary matters, the Executive Committee receives information from the investigator, openly discusses whether discipline should be instituted, and makes a recommendation to the warden concerning discipline. *Id.*

30. All harassment including, but not limited to harassment based on age, race, creed, color, religion, gender, sexual orientation, marital status, national origin, age or physical or mental disability is prohibited.

*Id.* Davis and Marsh were also found to be in violation of Iowa Department of Corrections policy AD–PR–18, which provides that the following conduct is impermissible in the workplace:

c. The conduct has the purpose or effect of unreasonably interfering with an employee's work performance or creating an intimidating, hostile or offensive work environment. . . .

i. Sexual jokes, remarks, or innuendoes about another person, or about women and men in general.

*Id.* at 59–62.[12]

Davis, Kent, and Marsh each filed a grievance with regard to their respective disciplinary action. As a result of the grievances, each Plaintiff's suspension was reduced by way of settlement agreement. Kent signed an agreement on January 9, 2006, which provided that his discipline would be rescinded and all lost wages and benefits restored. State Defs.' App. at 66. On January 20, 2006, Marsh signed an agreement which noted he "received alternate discipline of a paper suspension; therefore there wasn't any lost wages or accruals." *Id.* at 64. Thus, Marsh's agreement provided that so long as he had no "similar work rule violations" up to March 11, 2006, the written reprimand would be removed from his record. *Id.* On March 17, 2006, Davis signed an agreement vacating his suspension and requiring reimbursement of lost pay, sick leave, and vacation time. *Id.* at 63. *Id.* Kent's

Settlement Agreement provided that the "agreement sets no precedent for any pending or future grievances" and that "[t]he grievance underlying this case [ ] is hereby withdrawn with prejudice." *Id.* at 66. Marsh's and Davis' agreements, however, each contained paragraphs stating:

This Agreement is a good-faith settlement of all issues arising from the facts alleged in the grievance. No promises for any other, or future, consideration have been made by anyone. The above consideration is all that will be received for the claims and potential causes of action addressed and arising from the Grievant's claim in this grievance.

The terms of this settlement agreement are considered by the parties to pertain only to the specific facts involved in this matter. Neither party shall rely on this agreement or cite the same as precedent in any grievance, arbitration, litigation, or other proceeding in the future.

*Id.* at 63–65.

### III. STANDARD OF REVIEW

 Summary judgment has a special place in civil litigation. The device "has proven its usefulness as a means of avoiding full-dress trials in unwinnable cases, thereby freeing courts to utilize scarce judicial resources in more beneficial ways." *Mesnick v. Gen. Elec. Co.,* 950 F.2d 816, 822 (1st Cir.1991). In operation, the role of summary judgment is to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required. *See id.; see also Garside v. Osco Drug, Inc.,* 895 F.2d 46, 50 (1st Cir.1990). "[S]ummary judgment is an extreme remedy, and one which is not to be granted unless the movant has

**12.** With regard to Klubek's allegations against female NCF workers Julie Kline, Lynn Slykhuis, and Miller, Scott Miller testified at deposition that White did not investigate such matters because they "were not of a sexual harassment nature." State Defs.' App. at 159.

established his right to a judgment with such clarity as to leave no room for controversy and that the other party is not entitled to recover under any discernible circumstances." *Robert Johnson Grain Co. v. Chem. Interchange Co.*, 541 F.2d 207, 209 (8th Cir.1976) (citing *Windsor v. Bethesda Gen. Hosp.*, 523 F.2d 891, 893 n. 5 (8th Cir.1975)). The purpose of the rule is not " 'to cut litigants off from their right of trial by jury if they really have issues to try,' " *Poller v. Columbia Broad. Sys., Inc.*, 368 U.S. 464, 467, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962) (quoting *Sartor v. Ark. Natural Gas Corp.*, 321 U.S. 620, 627, 64 S.Ct. 724, 88 L.Ed. 967 (1944)), but to avoid "useless, expensive and time-consuming trials where there is actually no genuine, factual issue remaining to be tried." *Anderson v. Viking Pump Div., Houdaille Indus., Inc.*, 545 F.2d 1127, 1129 (8th Cir.1976) (citing *Lyons v. Board of Educ.*, 523 F.2d 340, 347 (8th Cir.1975)).

As employment actions are inherently fact based, the Eighth Circuit has repeatedly cautioned that summary judgment in such cases should "seldom be granted ... unless all the evidence points one way and is susceptible to no reasonable inferences sustaining the position of the nonmoving party." *Hindman v. Transkrit Corp.*, 145 F.3d 986, 990 (8th Cir. 1998) (citations omitted). *See also Crawford v. Runyon*, 37 F.3d 1338, 1341 (8th Cir.1994) (citing *Johnson v. Minn. Historical Soc'y*, 931 F.2d 1239, 1244 (8th Cir. 1991)) ("[S]ummary judgment should seldom be used in employment discrimination cases."); *Hillebrand v. M–Tron Indus., Inc.*, 827 F.2d 363, 364 (8th Cir.1987), *cert. denied*, 488 U.S. 1004, 109 S.Ct. 782, 102 L.Ed.2d 774 (1989). This is because "inferences are often the basis of the claim ... and 'summary judgment should not be granted unless the evidence could not support any reasonable inference' of discrimination." *Breeding v. Gallagher & Co.*, 164 F.3d 1151, 1156 (8th Cir.1999) (quoting *Lynn v. Deaconess Med. Ctr.-W. Campus*, 160 F.3d 484, 486–87 (8th Cir.1998)).

Nonetheless, the plain language of Federal Rule of Civil Procedure 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The precise standard for granting summary judgment is well-established and oft-repeated: summary judgment is properly granted when the record, viewed in the light most favorable to the nonmoving party and giving that party the benefit of all reasonable inferences, shows that there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Harlston v. McDonnell Douglas Corp.*, 37 F.3d 379, 382 (8th Cir.1994). The Court does not weigh the evidence nor make credibility determinations, rather it only determines whether there are any disputed issues and, if so, whether those issues are both genuine and material. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Wilson v. Myers*, 823 F.2d 253, 256 (8th Cir.1987) ("Summary judgment is not designed to weed out dubious claims, but to eliminate those claims with no basis in material fact.").

It is the unusual case where the party shouldering the burden of proof prevails on a summary judgment motion. *See Turner v. Ferguson*, 149 F.3d 821, 824 (8th Cir.1998) ("Summary judgments in favor of parties who have the burden of proof are rare, and rightly so.").

The moving party bears the initial burden of demonstrating the absence of a genuine

issue of material fact based on the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any. *See Celotex,* 477 U.S. at 323, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. Once the moving party has carried its burden, the nonmoving party must go beyond the pleadings and, by affidavits or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is genuine issue for trial. *See* Fed. R.Civ.P. 56(c), (e); *Celotex Corp.,* 477 U.S. at 322–23, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 257, 106 S.Ct. 2505. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat a motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson,* 477 U.S. at 247–48, 106 S.Ct. 2505. An issue is "genuine," if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party. *See id.* at 248, 106 S.Ct. 2505. "As to materiality, the substantive law will identify which facts are material.... Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

## IV. LAW AND ANALYSIS

### A. *The Grievance Releases*

State Defendants and DMACC Defendants both contend that Plaintiffs Davis and Marsh cannot maintain any claims against any of the Defendants because they signed releases. Davis's Settlement Agreement, in its entirety, states:

The State of Iowa, Department of Administrative Services, Department of Corrections, Newton Correction Facility, hereinafter State, and the United Electric Radio and Machine Workers of America Local 893 Iowa United Professionals, hereinafter Union, enter into the following Agreement in full and final resolution of the grievances filed by Jim

Davis ... regarding Article IV section 11 Discipline and Discharge.

This settlement arose out of a situation in which the Grievant received a five (5) day suspension without pay on August 11, 2005. Based on this situation the parties agree to the following:

1. The State will remove the forty (40) hour suspension.

2. The State will reimburse the Grievant for forty (40) hours of lost pay and will adjust his sick leave and vacation leave banks for any lost accruals.

3. This Agreement is a good-faith settlement of all issues arising from the facts alleged in the grievance. No promises for any other, or future, consideration have been made by anyone. The above consideration is all that will be received for the claims and potential causes of action addressed and arising from the Grievant's claim in this grievance.

4. The terms of this settlement agreement are considered by the parties to pertain only to the specific facts involved in this matter. Neither party shall rely on this agreement or cite the same as precedent in any grievance, arbitration, litigation, or other proceeding in the future.

State Defs.' App. at 63 (personal identifiers omitted). Marsh's Settlement Agreement provides:

The State of Iowa, Department of Administrative Services—Human Resource Enterprise, Department of Corrections—Newton Correction Facility, hereinafter State, and the American Federation of State, County, and Municipal Employees Iowa Council 61, hereinafter Union, enter into the following Agreement in full and final resolution of the grievance filed by Marty Marsh, hereinafter Grievant ... that alleges vi-

olations Article IV, Section 9 (Discipline and Discharge) of the 2005–07 Collective Bargaining Agreement between the parties.

This settlement arose out of a situation in which the Grievant was given a five (5) day suspension for violating the Newton Correctional Facility policy 3–7. The Grievant received alternative discipline of a paper suspension; therefore there wasn't any lost wages or accruals. Based on this situation the parties agree to the following:

1. The State will reduce the five (5) day suspension to a Written Reprimand. If no further similar work rule violations of NCF policy O.M. 3–7, Section ILD.24, up to March 11, 2006 the State will remove the Written Reprimand.

2. This Agreement is a good-faith settlement of all issues arising from the facts alleged in the grievance. No promises for any other, or future, consideration have been made by anyone. The above consideration is all that will be received for the claims and potential causes of action addressed and arising from the Grievant's claims in this grievance.

3. The terms of this settlement agreement are considered by the parties to pertain only to the specific facts involved in this matter. Neither party shall rely on this agreement or cite the same as precedent in any grievance, arbitration, litigation, or other proceeding in the future.

*Id.* at 64 (personal identifiers omitted).

State Defendants argue that the releases are unambiguous, and reflect acknowledgment by Davis and Marsh that the return of lost pay and the expungement of disciplinary records is "all that will be received" from even "potential" causes of action. State Defs.' Br. at 6. Further, State Defendants point out that their in-

tent in entering into the Settlement Agreements was that the "releases" contained therein would bar any future legal actions by Plaintiffs: "If it were now held that [State] Defendants were potentially subject to a lawsuit for money damages based on the rescinded disciplines, then they would have given up the right to discipline Davis and Marsh, paid them salary as well as vacation and sick leave accruals, and received absolutely nothing in exchange." *Id.* at 7. Similarly, DMACC Defendants argue that they are intended third-party beneficiaries to the releases and that the releases signed by Davis and Marsh were intended to release not only the State Defendants, but also the DMACC Defendants from "any future litigation regarding this matter." DMACC Defs.' Br. at 17.

■ Under the general rules of contract interpretation, the intent of the parties in creating the contract controls. *Smith Barney, Inc. v. Keeney*, 570 N.W.2d 75, 78 (Iowa 1997). Unless there is an ambiguity, however, the intent of the parties is determined by what the contract itself says. *Id.* (citing *Iowa Fuel & Minerals, Inc. v. Iowa State Bd. of Regents*, 471 N.W.2d 859, 862 (Iowa 1991)). "A contract is to be interpreted as a whole, and it is assumed in the first instance that no part of it is superfluous." *Id.* (citing *Iowa Fuel*, 471 N.W.2d at 863). "The interpretation that gives a reasonable, lawful, and effective meaning to all terms is preferred to an interpretation that leaves a portion of the agreement of no effect." *Id.* (citing *Iowa Fuel*, 471 N.W.2d at 863).

■ In interpreting a contract, the Court must engage in a two step process. *Walsh v. Nelson*, 622 N.W.2d 499, 503 (Iowa 2001). "First, from the words chosen, a court must determine 'what meanings are reasonably possible.'" *Id.* (quoting Restatement (Second) of Contracts § 202 cmt. a, at 87 (1981)). "In so doing,

the court determines whether a disputed term is ambiguous." *Id.* The question of whether a term is ambiguous will not be determined by the mere fact that the parties disagree about its meaning. *Id.* (citing *Hartig Drug Co. v. Hartig,* 602 N.W.2d 794, 797 (Iowa 1999)). Rather, a term is ambiguous if, " 'after all pertinent rules of interpretation have been considered,' 'a genuine uncertainty exists concerning which of two reasonable interpretations is proper.' " *Id.* (quoting *Hartig Drug Co.,* 602 N.W.2d at 797).

As a preliminary matter, the Court rejects DMACC Defendants' contention that they are third-party beneficiaries of the settlement agreements. *See Khabbaz v. Swartz,* 319 N.W.2d 279, 286 (Iowa 1982) (stating that incidental beneficiaries, as opposed to third-party beneficiaries, have no right to enforce the contract at issue). The Iowa Supreme Court has adopted the following principles from the Restatement (Second) of Contracts to determine when a stranger to a contract is nonetheless a third party beneficiary of that contract:

(1) Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either

(a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or

(b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.

(2) An incidental beneficiary is a beneficiary who is not an intended beneficiary.

*Vogan v. Hayes Appraisal Assoc., Inc.,* 588 N.W.2d 420, 423 (Iowa 1999) (citing *Tredrea v. Anesthesia & Analgesia, P.C.,* 584 N.W.2d 276, 281 (Iowa 1998) (quoting Restatement (Second) of Contracts § 302 (1979))). "The primary question" in determining whether DMACC Defendants are third-party beneficiaries to the Settlement Agreements is "whether the contract manifests an intent to benefit a third party." *Tredrea,* 584 N.W.2d at 281 (citing *Midwest Dredging Co. v. McAninch Corp.,* 424 N.W.2d 216, 224 (Iowa 1988)). The intent to benefit the third party need not, however, be an intent to confer a direct benefit on the third party. *Id.* The Iowa Supreme Court explained this concept in *Tredrea:*

[W]hen a contract is made, the two or more contracting parties have separate purposes; each is stimulated by various motives, some of which he may not be acutely conscious. The contract itself has no purpose, motive, or intent. The two parties may have purposes, motives and intentions; but they never have quite the same ones.

In third-party cases, the right of such party does not depend upon the purpose, motive, or intent of the promisor. The motivating cause of his making the promise is usually his desire for the consideration given by the promisee. In few cases will he be moved by a desire to benefit a third person....

A third party who is not a promisee and who gave no consideration has an enforceable right by reason of a contract made by two other[s] ... if the promised performance will be of pecuniary benefit to the third party and the contract is so expressed as to give the promisor reason to know that such benefit is contemplated by the promisee as one of the motivating causes of his making the contract.

584 N.W.2d at 281–82. Accordingly, the Court must "look to the contract itself, and to the circumstances surrounding it, to determine if there was an intent" by the named parties to the contracts to benefit

the DMACC Defendants. *Midwest Dredging Co.*, 424 N.W.2d at 225.

■ Reviewing the Settlement Agreements, it is clear that there is absolutely no reference therein to any intended third-party beneficiary. The parties to the contract are succinctly stated as being the State of Iowa and NCF, Plaintiffs Davis and Marsh, and Davis' and Marsh's respective unions. No reference is made to any other employee or agent of the parties to the contract, or to any other individual or entity. Indeed, the terms of the agreement clearly reference the intent of the State and NCF to engage in "full and final resolution" of the grievances filed by Marsh and Davis. Moreover, while State Defendants and DMACC Defendants point to Warden Mapes' deposition testimony in support of the contention that NCF intended the Settlement Agreements to include a release of all potential claims by Plaintiffs as to both the State Defendants and the DMACC Defendants,[13] Plaintiffs have pointed the Court toward clear evidence that Plaintiffs did *not* intend to relinquish all claims against all parties affiliated in any way with their disciplinary actions or the grievance procedures relevant thereto. *See* Pls.' App. in Resistance to DMACC Defs.' Mot. for Summ. J. (hereinafter "Pls.' DMACC App.") at 2 (Davis testifying at deposition about his belief that the Settlement Agreement "pertains to this particular grievance . . . and grievances in the future. That's the way I understand it. I was told by my union president that this in no way, shape, or form would stop me from litigation, future litigation."); 19 (Marsh testifying at deposition that "There had been an attempt to place a clause [in the Settlement Agreement] that said that we would not sue them after this . . . .[14] We said that we

13. At Warden Mapes' deposition, the following colloquy ensued:

Q. And was it your understanding that each of those [Settlement Agreements] were to resolve any potential litigation as well?
A. When we do a settlement agreement, the purpose of a settlement is to prevent it from any further action, whether that be grievance, arbitration, litigation. We're agreeing that this is a final resolution of the case and all the information surrounding it. . . .
Q. So it was your understanding that was to include any potential litigation as well?
A. Absolutely, to dispose of the case once and for all. Had it not been so, we would not have agreed to it.
Q. Okay. And that would be any lawsuits against the state of Iowa?
A. Correct.
Q. Any lawsuits against you or any individual employees here?
A. Correct. We have nothing to gain in settling them if it doesn't prevent us from having to go through additional steps.
Q. Would that include people you do business with here like DMACC and the DMACC employees as well?
A. Correct.
State Defs.' App. at 139–40.

14. The clause to which Marsh apparently refers appears in what Plaintiffs contend was a draft Settlement Agreement that preceded the final Settlement Agreements in the record. Specifically, the draft agreement that Plaintiffs claim to have rejected provided:

The terms of this settlement agreement are considered by the parties to pertain only to the specific facts involved in this matter. Neither party shall rely on this agreement or cite the same as precedent in any grievance, arbitration, litigation, or other proceeding in the future. This agreement and release is a good faith settlement of the issues raised by in [sic] his grievance. Further, [name] hereby unconditionally releases, acquits, and forever discharges the State of Iowa, Iowa Department of Corrections, Newton Correctional Facility, and Iowa Department of Administrative Services Human Resource Enterprise, its officers, employees, and agents and any and all persons, from all liabilities whatsoever including all claims, demands, causes of action and suits of every nature including all claims cognizable under federal or state statute or common law, affecting the Grievant which he may have or ever claim to have by reason of the facts giving rise to

absolutely would not agree to anything that would prevent us from suing afterward, so we had them take that out.... [M]y union called Todd Sadler [the individual who facilitated the settlement agreements] and confirmed that that would not prevent me from suing."). Given that the language of the Settlement Agreements does not contemplate any third-party beneficiaries, and given that there are genuine issues of material fact regarding the parties' intentions regarding third party beneficiaries to the Settlement Agreements, the Court cannot find as a matter of law that DMACC Defendants were intended third-party beneficiaries to the Settlement Agreements.

Moreover, even assuming that DMACC Defendants were, in fact, intended third-party beneficiaries to the releases contained in the Settlement Agreements, the Court is not convinced that the releases operate to bar Davis' and Marsh's claims in the present action. The plain language of the release provides that the parties are agreeing to settle "all issues *arising from* the *facts alleged in the grievance.*" State

Defs.' App. at 63, 64 (emphasis added). Likewise, the release provides that the consideration received by Plaintiffs is all that they will get "for the claims and potential causes of action *addressed and arising from the Grievant's claims in this Grievance.*" *Id.* (emphasis added). None of the parties to this litigation, however, have provided the Court with a copy of either Davis' or Marsh's grievance, making it impossible for the Court to determine the scope of the alleged waiver.[15] That is, the Court is unable to determine if the present claims "aris[e] from the facts alleged in the grievance," or if the present claims were "addressed and aris[e] from the Grievant's claims" asserted in their grievances. Accordingly, summary judgment in favor of either the State Defendants or the DMACC Defendants is improper on the basis of the Settlement Agreements and the related record now before the Court.

B. *Gender Discrimination*

Kent, Davis, and Marsh each allege that the State Defendants are liable for gender discrimination, in violation of Title VII and the ICRA.[16] Specifically,

the appeals addressed in the aforementioned case, including but not limited to all cases involving age, race, creed, color, sex, national origin, religion, or disability claims, any and all claims involving attorney fees and costs. It is further agreed that this release covers all injuries and damages whether known or not and which may hereafter appear to develop arising from the matters above referenced. The consideration subsequently addressed is all that will be received for the Appellant's claims and potential causes of action or suit, and no promise for any other or future consideration has been made by anyone. Pls.' DMACC App. at 97. The only actual copy of the purportedly rejected settlement agreement in the record, however, pertains specifically to Plaintiff Kent. Kent's final settlement agreement did not contain a release provision similar to that found in Davis' and Marsh's ultimate settlement agreements, and none of the Defendants contend that Kent's settlement agreement bars the present litiga-

tion. Nonetheless, the fact that the State clearly had the wherewithal to draft a release containing an extensive waiver of future litigation rights does weigh in favor of a conclusion that the Settlement Agreements actually contemplated a less extensive waiver of litigation rights.

15. The Court notes that despite State Defendants' assertion to the contrary, they would not have received "nothing" in exchange for the settlements, even if the settlements are not deemed to bar the present litigation. Indeed, it is clear that the settlement agreements would bar further action arising from the grievance process itself, such as arbitration or the pursuit by Plaintiffs of legal claims arising under the terms of the respective union collective bargaining agreements.

16. Plaintiffs' assertions of gender discrimination are raised under both Title VII and the ICRA. Federal case law supplies the basic framework for deciding cases under the

each Plaintiff contends that State Defendants [17] discriminated against him on the basis of his gender because they "did not investigate and/or discipline female employees concerning allegations made against them by Klubek which were similar to the allegations made against Plaintiff[s]." *See* Kent Compl. ¶ 26; Davis Compl. ¶ 25; Marsh Compl. ¶ 25.

▬▬▬ Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Plaintiffs do not allege direct evidence of gender discrimination in this matter. *See Beshears v. Asbill,* 930 F.2d 1348, 1354 (8th Cir.1991) ("[D]irect evidence may include evidence of actions or remarks of the employer that reflect a discriminatory attitude ... [c]omments which demonstrate a 'discriminatory animus in the decisional process' ... or those uttered by individuals closely involved in employment decisions may constitute direct evidence." (citations omitted)). Thus, Plaintiffs bear the burden of proving discrimination indirectly. Where a plaintiff relies on circumstantial, rather than direct, evidence of intentional discrimination, the Court applies the three-stage burden shifting approach developed by the Supreme Court in *McDon-*

*nell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and later refined in *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). *See St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506–07, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Dammen v. UniMed Med. Ctr.,* 236 F.3d 978, 980 (8th Cir.2001).

▬▬▬ Under the *McDonnell Douglas* framework, plaintiffs bear the initial burden of establishing a prima facie case of discrimination. *See McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. To establish a prima facie case of gender discrimination on a disparate treatment theory, such as that alleged here, a plaintiff must demonstrate that: (1) he is within a protected class; (2) he is qualified to perform his job, or was meeting the legitimate expectations of his employer; (3) he suffered an adverse employment action; and (4) similarly situated employees outside the protected class were treated more favorably. *See Schoffstall v. Henderson,* 223 F.3d 818, 825 (8th Cir.2000); *Clark v. Runyon,* 218 F.3d 915, 918 (8th Cir.2000); *Whitley v. Peer Review Sys., Inc.,* 221 F.3d 1053, 1055 (8th Cir.2000). In light of the fact that Plaintiffs are male, the *McDonnell Douglas* prima facie test requires an additional step. The Eighth Circuit Court of Appeals has held that to establish a prima facie case of reverse gender discrimination, a plaintiff must ei-

---

ICRA. *Quick v. Donaldson Co., Inc.,* 90 F.3d 1372, 1380 (8th Cir.1996) (citing *Iowa State Fairgrounds Sec. v. Iowa Civil Rights Comm'n,* 322 N.W.2d 293, 296 (1982)). Iowa courts "traditionally turn to federal law for guidance on evaluating the ICRA, but federal law ... is not controlling." *Vivian v. Madison,* 601 N.W.2d 872, 873 (Iowa 1999) (citations omitted). The similarities between state and federal law in this arena are so substantial, however, that the Court will address Plaintiff's state and federal law claims together.

17. As noted previously, Plaintiffs' gender discrimination claims are against only the State Defendants. All three Complaints name the State of Iowa, NCF, Van Gorp, Boggess, Weitzell, and White as Defendants in the gender discrimination claim. Kent's and Davis' Complaints additionally name Lipscomb and Mapes. Davis' Complaint also names Scott Miller as a Defendant.

ther present direct evidence or show "that background circumstances support the suspicion that the defendant is that unusual employer who discriminates against the majority." *Duffy v. Wolle,* 123 F.3d 1026, 1036 (8th Cir.1997) (quoting *Notari v. Denver Water Dep't,* 971 F.2d 585, 590 (10th Cir.1992) (internal citations and quotations omitted)).

 If Plaintiffs establish a prima facie case, the burden of production shifts at the second stage to the State Defendants, who must articulate some legitimate, nondiscriminatory reason for the adverse employment action. *Burdine,* 450 U.S. at 253, 101 S.Ct. 1089. If the State Defendants carry this burden of production, the presumption raised by the prima facie case is rebutted and "drops from the case." *Id.* at 255 n. 10, 101 S.Ct. 1089. The burden then shifts back at the third and final stage to Plaintiffs, who are given the opportunity to show that the employer's proffered reason was merely a pretext for discrimination. *Id.* at 253, 101 S.Ct. 1089. The ultimate burden remains with Plaintiffs at all times to persuade the trier of fact that the adverse employment action was motivated by intentional discrimination. *Id.* In the present case, the State Defendants challenge the third and fourth prongs of the traditional prima facie analysis, that is, the State Defendants contend that Plaintiffs cannot show either an adverse employment action or that similarly situated females were treated more favorably the Plaintiffs. State Defendants also contend that Plaintiffs cannot demonstrate that "background circumstances support the suspicion that the defendant is the unusual employer who discriminates against the majority." *See Duffy,* 123 F.3d at 1036.

*1. Did Plaintiffs suffer an adverse employment action?*

 In order to establish a prima facie case of gender discrimination, each plaintiff must demonstrate that he suffered an adverse employment action. *LaCroix v. Sears, Roebuck, and Co.,* 240 F.3d 688, 693 (8th Cir.2001). The Eighth Circuit has stated that "[n]ot everything that makes an employee unhappy is an actionable adverse employment action.... Rather, an adverse employment action is exhibited by a material employment disadvantage, such as a change in salary, benefits or responsibilities." *Id.* at 691. " 'Mere inconvenience without any decrease in title, salary, or benefits is insufficient to show an adverse employment action.' " *Sallis v. Univ. of Minn.,* 408 F.3d 470, 476 (8th Cir.2005) (quoting *Cruzan v. Special Sch. Dist. No. 1,* 294 F.3d 981, 984 (8th Cir. 2002)). Minor changes in working conditions that inconvenience an employee or alter the employee's work responsibilities do not rise to the level of an adverse employment action. *Sallis,* 408 F.3d at 476. Applying this high standard, the Eighth Circuit has concluded that "[c]onduct that is merely rude, abrasive, unkind, or insensitive does not come within the scope of the law." *Shaver v. Indep. Stave Co.,* 350 F.3d 716, 721 (8th Cir.2003) (construing the Americans with Disabilities Act and observing that "anti-discrimination laws do not create a general civility code").

 It is undisputed that each Plaintiff was initially suspended without pay for engaging in or participating in "inappropriate conversation in front of another staff person who found the conversation offensive." *See* State Defs.' App. at 57–62. Kent was suspended for two days, while Davis and Marsh were each suspended for five days. *Id.* Each Plaintiff actually served his suspension and lost pay in their corresponding paychecks.[18] Pls.'

---

**18.** The Court notes that Marsh's Settlement Agreement provides that he "received alternative discipline of a paper suspension" such

that he did not suffer "any lost wages or accruals." State Defs.' App. at 64. The par-

State Facts ¶ 13. As a general rule, being suspended without pay is sufficient to state an adverse employment action. *See McClure v. Career Sys. Dev. Corp.*, 447 F.3d 1133, 1137 (8th Cir.2006). The facts in the present case do not, however, end with Plaintiffs serving their suspensions. Rather, each Plaintiff filed a grievance with regard to his suspension. Several months after the suspensions were actually served, each Plaintiff's suspension was ultimately rescinded and each received back pay and the reinstatement of any lost benefits.

Case law addressing this type of situation has produced mixed results. State Defendants point the Court to a series of cases holding that initial employment decisions that are later reversed are not actionable adverse employment actions under Title VII. *See* State Defs.' Reply Br. at 2. For instance, in *Dobbs–Weinstein v. Vanderbilt University*, the plaintiff was denied tenure and informed that her teaching appointment at Vanderbilt University would conclude the following year. 185 F.3d 542, 543 (6th Cir.1999). The plaintiff filed an internal grievance and, ultimately, a Title VII gender discrimination claim. *Id.* After the plaintiff's employment ended, but while her Title VII lawsuit was still pending, the Vanderbilt Board of Trustees reversed the tenure decision and rehired the plaintiff as a tenured professor with full back pay. *Id.* The Sixth Circuit held that the plaintiff had not suffered a cognizable Title VII adverse employment action, noting that " 'tenure decisions in an academic setting involve a combination of factors which tend to set them apart from employment decisions generally.' " *Id.* (quoting *Zahorik v. Cornell Univ.*, 729 F.2d 85, 92–93 (2d Cir.

1984)). Specifically, the *Dobbs–Weinstein* court relied on *Page v. Bolger* to determine that the initial tenure decision was not an "ultimate employment decision":

> [Dobbs–Weinstein] has not here suffered a final or lasting adverse employment action sufficient to create a prima facie case of employment discrimination under Title VII. To rule otherwise would be to encourage litigation before the employer has an opportunity to correct through internal grievance procedures any wrong it may have committed.

*Id.* at 546 (citing *Page v. Bolger*, 645 F.2d 227, 233 (4th Cir.1981) ("Disparate treatment theory ... and comparable provisions of Title VII ... ha[ve] consistently focused on the question whether there has been discrimination in what could be characterized as ultimate employment decisions.... [I]t is obvious to us that there are many interlocutory or mediate decisions having no immediate effect upon employment conditions which were not intended to fall within the ... proscriptions ... of Title VII.")).

The Eighth Circuit reached a similar conclusion in *Okruhlik v. University of Arkansas*, another tenure case. 395 F.3d 872 (8th Cir.2005). There, the plaintiff sued under Title VII, claiming that her denial of tenure was motivated by a discriminatory animus. *Id.* at 877. The district court granted summary judgment in favor of the defendant, concluding that the plaintiff could not demonstrate that she had suffered an adverse employment action because she had failed to complete all levels of the tenure review process. *Id.* at 877–78. Specifically, the plaintiff did not appeal the denial of tenure to the university's president, despite a university policy providing "that a final decision on tenure

---

ties, however, routinely refer to fact that the "Plaintiffs" all served their suspensions. The distinction does not make a substantive difference in the Court's analysis. Therefore, the

Court will treat Marsh's suspension as though it was actually served in the same manner as Kent's and Davis' suspensions.

has not been made until the president has issued his decision." *Id.* at 880. The Court of Appeals affirmed the decision of the district court. *Id.* at 879–80. Noting the particular university policies on the tenure review process, and the fact that the "academic setting and complex nature of tenure decisions ... distinguishes them from employment decisions generally," the Court adopted the principles of *Dobbs–Weinstein* in concluding that a university "should have the opportunity to correct errors through its complete internal appeals process that precedes its final decision." *Id.* at 879 (citing *Howze v. Virginia Polytechnic Inst. & State Univ.*, 901 F.Supp. 1091, 1097 (W.D.Va.1995) ("[W]here the tenure decision was following the chain of appeal, each decision along the way is not actionable. Only the final decision is the ultimate act.")).[19]

Most cases that have reached a conclusion that only ultimate employment decisions are actionable, including *Okruhlik,* explicitly relied on *Dobbs–Weinstein* in their reasoning. In 2004, however, the Sixth Circuit explicitly rejected the "ultimate employment decision" standard it employed in *Dobbs–Weinstein,* at least with regard to cases that do not involve tenure decisions:

> We now join the majority of other circuits in rejecting the "ultimate employment decision" standard. First and foremost, it is contrary to the plain language of Title VII, which provides that an employer must not "discriminate against" an employee based upon a prohibited classification. As this court has found, the words "discriminate against" literally mean "any kind of adverse action." Congress could have provided that employers shall not "discriminate against an employee when making ultimate employment decisions," but instead it chose to use the words "discriminate against" with no such qualifier.
>
> Second, the employment action taken in the present case (suspension without pay for thirty-seven days) is not the type of employment action that this court developed the adverse-employment-action element to filter. The adverse-employment-action element is a warranted judicial interpretation of Title VII intended to deter discrimination lawsuits based on trivial employment actions, such as those that cause a "mere inconvenience" or a "bruised ego." But as an exception to the strictly literal reading of the statute, the adverse-employment-action element of a Title VII lawsuit must not be interpreted too broadly. Taking away an employee's paycheck for over a month is not trivial, and if motivated by discriminatory intent, it violates Title VII.
>
> Third, the "ultimate employment decision" standard contravenes "the purpose of Title VII to make persons whole for

---

19. State Defendants also cite several non-tenure cases in support of their contention that Plaintiffs cannot prove an adverse employment action in the present case. For example, in *Estades–Negroni v. Associates Corp.,* the First Circuit found that a plaintiff "failed at the threshold" to show an adverse employment action under the ADEA where a disabled employee was denied long-term disability benefits and was terminated from her job, but ultimately obtained a favorable appeal and was "reinstated *retroactively* and *with benefits.*" 377 F.3d 58, 63 (1st Cir.2004) (emphasis in original). Likewise in *Pennington v.* *City of Huntsville,* the Eleventh Circuit cited *Dobbs–Weinstein* in support of the proposition that "when an employee loses pay or an employment benefit from a delayed promotion, courts have held that the employment action is not adverse only when the action is rescinded and backpay is awarded." 261 F.3d 1262, 1267 (11th Cir.2001); *see also Brooks v. City of San Mateo,* 229 F.3d 917, 929–30 (9th Cir.2000) (relying on *Dobbs–Weinstein* to conclude that because a negative employee evaluation could have been changed during the appeal processes, "it was not sufficiently final to constitute an adverse employment action").

injuries suffered on account of unlawful employment discrimination." While the standard ensures that a wrongfully suspended employee eventually receives back pay, it allows an employer unilaterally to cut off the employee's claims for other damages, which have been explicitly authorized by Title VII since the Civil Rights Act of 1991, such as interest on the back pay, attorney's fees, emotional suffering, and punitive damages. Although Burlington Northern argues that it made White whole when it granted her back pay, Congress has declared that part of making a Title VII plaintiff whole is compensating her for interest on the back pay, attorney's fees, and emotional suffering. In this case, the jury found that White had suffered $43,500 in damages other than back pay due to Burlington Northern's retaliation. Lastly, the "ultimate employment decision" standard is in tension with Supreme Court cases holding that the statute of limitations on a Title VII claim is not tolled during the pendency of an internal grievance process. According to the Supreme Court, a Title VII claim arises on the date the alleged discriminatory decision occurs, even though an employee has challenged the decision via an internal grievance process. The Supreme Court has rejected the argument that the pendency of an internal grievance process renders the

employment decision "tentative" or "non-final" for purposes of Title VII. The Supreme Court has also rejected the argument that "the danger of possible conflict between the concurrent pursuit of both collective-bargaining and Title VII remedies should result in tolling the limitations period for the latter while the former proceeds to conclusion." The alleged discriminatory decision in the present case was the suspension without pay. White's election to challenge this decision through an internal grievance process does not render the decision not actionable under Title VII.[20]

*White v. Burlington N. Santa Fe. Rwy. Co.*, 364 F.3d 789, 801–03 (6th Cir.2004) (internal citations and quotations omitted).

Other courts have employed reasoning similar to that in *White* to conclude that an adverse employment action is *not* negated for purposes of Title VII merely because the employer later remedied the adverse action. In *Lovejoy–Wilson v. NOCO Motor Fuel, Inc.*, for example, an employee was suspended for one week without pay, but was later reimbursed for her lost wages. 263 F.3d 208, 223 (2d Cir.2001). The Second Circuit found that a reasonable jury could find that the plaintiff suffered an adverse employment action because she "at least suffered the loss of the use of her wages for a time."[21] *Id.* at 224; *see also Phelan v. Cook County*, 463 F.3d

---

**20.** The Sixth Circuit specifically left open the possibility that the "ultimate employment decision" standard might survive in tenure settings:

> We recognize that our decision in *Dobbs–Weinstein* was based in part upon the unique nature of "tenure decisions in an academic setting." Other circuits have also acknowledged the unique nature of tenure decisions. Because we are not presented here with a denial of tenure, we do not decide to what extent our holding in *Dobbs–Weinstein* survives our decision in this case.

*White v. Burlington N. Santa Fe. Rwy. Co.*, 364 F.3d 789, 802 n. 7 (6th Cir.2004).

**21.** While Plaintiffs do not cite *Lovejoy–Wilson* or any other case that directly supports the proposition that suspensions that are later rescinded are still adverse employment actions for purposes of gender discrimination litigation, it appears clear that Plaintiffs are requesting that the Court reach a conclusion similar to that of *Lovejoy–Wilson*. *See* Pls.' State Br. at 28 ("An employee that serves an unpaid suspension loses pay for a significant period of time even if the Department of Ad-

773, 780 (7th Cir.2006) (concluding that an employee that was terminated, but later reinstated and awarded back pay, had stated an adverse employment action: "Consistent with Title VII's goal of deterring discrimination, we decline to endorse a rule that would allow employers to escape liability by merely reinstating the aggrieved employee months after termination, whenever it becomes clear that the employee intends to pursue her claims in court. Such a rule could create an unintended economic incentive for employers to reinstate an employee who files a discrimination suit as a means to avoid Title VII penalties whenever the costs of reinstating the employee are lower than the employer's exposure in a[ ] Title VII suit"); *Roberts v. Roadway Exp., Inc.*, 149 F.3d 1098, 1104 (10th Cir.1998) ("Actions such as suspensions or terminations are by their nature adverse, even if subsequently withdrawn.").

■ Having reviewed the well-reasoned case law on both sides of the issue, the Court finds the reasoning of *White* compelling, and concurs with its rejection of the "ultimate employment decision"

standard in non-tenure cases as contrary to both the plain language of Title VII and Title VII's intent to make whole persons who have suffered unlawful employment discrimination.[22] *White*, 364 F.3d at 801–03. The facts in the present case are, however, readily distinguishable from those in *White*, such that the Court declines to adopt the ultimate conclusion in *White* that the plaintiff suffered an adverse employment action. In *White*, the plaintiff was suspended without pay for a period of thirty-seven days, a far more substantial period of time than the five day suspensions without pay of Davis and Marsh and the two day suspension without pay of Kent. Indeed, the facts in this case are more similar to those in *Lovejoy*, where the plaintiff was suspended for a period of one week without pay, but ultimately received full backpay. *See Lovejoy*, 263 F.3d at 223–24. The Court, however, also rejects the Second Circuit's apparent conclusion in *Lovejoy* that an adverse employment action can be established merely on the basis that an employee "suffer[s] the loss of the use of [ ] wages for a time." *Id.* at 224.[23]

ministrative Services later rescinds the discipline to avoid an arbitration hearing. Essentially, the employee must make ends meet without that pay until such time as the employee can challenge the action through the grievance process. This constitutes a significant alteration of the terms [and] conditions of employment. It is difficult to conceive how a several month delay in receiving pay would not be a change in the terms [and] conditions of employment for an employee that regularly gets paid. An employee that serves the suspension must engage in the entire grievance process to clear his name. An employee that is suspended suffers reputational and emotional damages.").

**22.** The Court specifically finds *Dobbs–Weinstein* and, more significantly, the Eighth Circuit's decision in *Okruhlik* is not controlling in the present matter. As noted, both decisions were decided in the specific context of

tenure decisions. *Okruhlik* was additionally decided on the specific university policy regarding the tenure process there at issue. *See Okruhlik*, 395 F.3d at 879–80. To conclude that *Okruhlik* stands for the proposition that an "ultimate employment decision" must be rendered in non-tenure cases before a plaintiff can state an adverse employment action is to read the case far too broadly, particularly given *Okruhlik's* explicit recognition that tenure decisions are distinguishable from "employment decisions generally." *Id.* at 879.

**23.** *Lovejoy's* apparent position in this regard is in conflict with well-settled Eighth Circuit law providing that an "adverse employment action is a *tangible* change in working conditions that produces a *material* employment disadvantage." *Wedow v. City of Kansas City, Mo.*, 442 F.3d 661, 671 (8th Cir.2006) (emphasis added). Employment actions that amount to "mere inconvenience" or that

On the present facts, this Court cannot say that losing the use of five days pay (or two days pay in Kent's case) for a period of time rises to the level of a "material" employment disadvantage. Such a conclusion would "invite 'judicial micromanagement' of temporary employment disputes that have already been resolved through internal processes." *Dickerson v. SecTek, Inc.*, 238 F.Supp.2d 66, 80 (D.D.C.2002) ("The Court can thus find no compelling reason to conclude that short suspensions that leave no lasting effect on either the employee's present or future position or her pocketbook are adverse employment actions."). Thus, while the Court concurs with *White* and *Lovejoy* that a plaintiff *may* be able to state an adverse employment action when he is disciplined, but later awarded back pay, the present factual scenario cannot support a conclusion that Plaintiffs suffered more than a de minimus change in their working conditions because of the delay in receiving their back pay. Accordingly, Plaintiffs did not suffer a "material" employment disadvantage and cannot demonstrate that they suffered an adverse employment action.

Strong support for the Court's determination in this regard can be found in the Eighth Circuit's decision in *Jackson v. United Parcel Service, Inc.*, 548 F.3d 1137 (8th Cir.2008), a case that was notably not cited by either party.[24] In *Jackson*, a UPS driver was disqualified from her position as a "feeder driver" following an accident, and was reassigned to work as an "air shuttle driver" at a lower rate of pay. *Id.* at 1139. After the plaintiff field a grievance and a charge of discrimination with the EEOC, UPS determined that its disqualification of plaintiff as a feeder driver was erroneous. *Id.* Approximately three months after plaintiff filed her grievance, the parties reached a settlement wherein the plaintiff was reinstated as a feeder driver and was awarded full back pay. *Id.* In rejecting the plaintiff's contention that the initial disqualification decision was an adverse employment action sufficient to support her disparate treatment claim, the Eighth Circuit stated:

> This court has held that a demotion or denial of a promotion, even when accompanied by a loss in pay, is not an adverse employment action when it is corrected in a timely manner. In *Fair [v. Norris,*

---

cause "minor changes in working conditions" are insufficient as a matter of law to constitute an adverse employment action. *Id.*

24. Additional support for the Court's determination that the Plaintiffs have not stated an employment disadvantage sufficiently "material" to be considered an adverse employment action can be found in decisions in both the Sixth and Seventh Circuits. In *Plautz v. Potter*, for example, the plaintiff claimed he had suffered an adverse employment action because his employer had improperly docked him one day's pay. 156 Fed.Appx. 812, 814–15 (6th Cir.2005). After realizing its mistake, the employer restored the plaintiff's pay in his next paycheck. *Id.* The Sixth Circuit Court of Appeals distinguished the loss of pay in *Plautz* from that in *White*, emphasizing that "the adverse-employment action element was designed to filter out discrimination cases that

caused 'merely inconvenience' or a 'bruised ego.'" *Id.* at 817. Noting that the thirty-seven day loss of pay in *White* went "beyond inconvenience," the *Plautz* court held that "the postponement of one-day's pay for one pay period had only a negligible impact on Plautz's income and does not rise to the level of an adverse employment action." *Id.* Likewise, in *Rhodes v. Illinois Department of Transportation*, the Seventh Circuit found that a female employee who had been improperly marked as absent and denied one day's pay had failed to state an adverse employment action, even though she was never compensated for the lost pay: "[T]his single absence had only a negligible impact on [plaintiff's] income, and did not cause her material harm.... Accordingly, [plaintiff] did not submit evidence of a materially adverse employment action within the meaning of Title VII." 359 F.3d 498, 505 (7th Cir.2004).

480 F.3d 865, 870 (8th Cir.2007)], the plaintiff was denied a promotion when the Arkansas Department of Corrections (ADC) failed, in error, to give her credit for her master's degree. As a result, Fair was eliminated from consideration for promotion. After Fair filed a grievance, ADC discovered its mistake and offered her the promotion and a raise retroactive to the date on which ADC would have promoted her absent the mistake. Fair declined the position, asserting that the raise was inadequate, and filed a complaint alleging racial discrimination. The district court dismissed the complaint.

We affirmed the dismissal of Fair's complaint because she did not suffer an adverse employment action. We acknowledged that Fair was initially rejected for the position and that "[h]ad the ADC not taken corrective action and offered Fair the job after reviewing her grievance, she may have been able to present a prima facie case of discrimination." However, "the ADC acted upon th[e] grievance ... and attempted to right its prior wrong," which was "the kind of extrajudicial corrective action envisioned by Congress when it passed Title VII." In rejecting Fair's contention that she should not have had to file a grievance to receive the promotion, we noted that "[o]nly twenty-two days lapsed between the filing of Fair's grievance and the ADC's offer of the promotion, an offer that included retroactive pay and benefits." "[T]his delay amounted to no more than a 'mere inconvenience' and [did] not give rise to an actionable Title VII claim."

In the present case, UPS recognized its mistake, took corrective action, and reinstated Jackson with full back pay and no loss of seniority or any other employment benefit. During her three-month period of disqualification, Jackson performed her prior work as a shuttle driv-er and was compensated accordingly. The only damages that might remain are interest on Jackson's back pay and stress that Jackson alleges accompanied her disqualification. This court has consistently held that "[an] adverse employment action must be one that produces a *material* employment disadvantage." *Kerns v. Capital Graphics, Inc.*, 178 F.3d 1011, 1016 (8th Cir.1999) (emphasis added) (quotation omitted). The small amount of interest Jackson might recover does not constitute a material disadvantage. This finding is bolstered by the fact that Jackson voluntarily postponed her grievance hearing, perhaps prolonging by a month the period during which she received less pay....

We hold that Jackson failed to establish a prima facie case of race or gender discrimination because UPS's initial disqualification decision did not constitute an adverse employment action. The facts of this case, viewed in the light most favorable to Jackson, simply do not establish a "material employment disadvantage." Jackson's disqualification period was "no more than a mere inconvenience" and does not give rise to an actionable claim for discrimination....

*Id.* at 1141–42.

*Jackson* also directly addresses Plaintiffs' argument that a finding of no adverse employment action on the present facts "significantly changes the landscape of adverse employment actions and discrimination cases for employees that retain their positions with the employer." Pls.' State Br. at 39. Specifically, Plaintiff makes an argument similar to that in Phelan, contending that if employers can "escape liability by later rescinding discipline," it will "open[ ] the door to employers demoting employees for extended periods of time, forcing an employee to take action through

the discrimination law and then undermining that action by rescinding the discriminatory adverse employment action." *Id.* According to Plaintiffs, this would mean that employers could discriminate against employees by demoting them or taking other adverse actions, but escape Title VII liability merely by "rescind[ing] the discipline just before the summary judgment deadline." *Id.* The Eighth Circuit addressed precisely this argument in Jackson when it stated:

> [W]e do not find that rescinding a prior employment action will always shield an employer from liability. Such a broad rule would permit employers to escape Title VII liability merely by correcting their discriminatory acts after a significant amount of time has passed or only when litigation has been threatened. *See Crawford v. Carroll,* 529 F.3d 961, 972 (11th Cir.2008). However, holding that corrective action never protects an employer from liability might create equally perverse incentives. If we allow Jackson's claim to proceed in the present case, we would undermine UPS's formal grievance process. Indeed, if an employer could be sued for discrimination even after promptly correcting an alleged wrong, there would be little incentive for "the kind of extrajudicial corrective action envisioned by Congress when it passed Title VII." *Fair,* 480 F.3d at 870. Therefore, because UPS promptly reinstated Jackson with full

back pay and seniority, its initial disqualification decision was not an adverse employment action.

548 F.3d at 1142.

 In the present case, each Plaintiff was issued his disciplinary letter on August 11, 2005. *See* State Defs.' App. at 57–62. Kent, Davis, and Marsh each filed a grievance and each entered into a settlement agreement in full settlement of the grievance on, respectively, January 9, 2006, January 13, 2006, and March 17, 2006.[25] After the settlements, each Plaintiff received all back pay and benefits lost by virtue of his suspension. Thus, each Plaintiff has been fully restored, save for any nominal interest on back pay or any emotional damages that Plaintiffs may claim to have suffered as a result of their suspensions. Under *Jackson,* these remaining damages are insufficient to constitute adverse employment actions under Title VII. Further, while the delay in receiving back pay in this case was longer than that in either *Jackson* or *Fair,*[26] there is no indication that the delay was the result of any bad faith on the part of State Defendants or that the resolution of the Plaintiffs' grievances was anything other than prompt under the circumstances. Accordingly, the Court finds that the "delay amounted to no more than a 'mere inconvenience' and [does] not give rise to an actionable Title VII claim." *See Jackson,* 548 F.3d at 1141 (quoting *Fair,* 480 F.3d at 870).

---

**25.** The dates provided are the dates on the settlement agreements, despite the fact that each was not signed by some of the parties until a nominally later date. *See* State Defs.' App. at 63–66.

**26.** In *Fair,* the delay between the filing of the grievance and the offer to correct was twenty-two days. *Fair,* 480 F.3d at 870. In *Jackson,* the delay between the filing of the grievance

and the settlement was approximately three months. *Jackson,* 548 F.3d at 1139–40. In the present cases, it is unclear what date the Plaintiffs' grievances were filed, but the delay between Kent's and Marsh's disciplinary actions and settlements was approximately five months, while the delay between the disciplinary action and the settlement for Davis was approximately seven months.

2. *Were similarly situated females treated more favorably?*

██ Even assuming Plaintiffs could establish that they suffered adverse employment actions, Plaintiffs' claims of gender discrimination would nonetheless fail because Plaintiffs cannot demonstrate that similarly situated females were treated more favorably. There are two competing lines of jurisprudence in the Eighth Circuit regarding the requisite standard for a prima facie case of gender discrimination under the "similarly situated" prong of the Title VII analysis. In the first, to establish a prima facie case of gender discrimination, Plaintiffs must not only identify females who were treated more favorably, but also bear the burden of proving by a preponderance of the evidence that the female employees who were treated more favorably were " 'similarly situated in all relevant respects.' " *Jones v. Frank*, 973 F.2d 673, 676 (8th Cir.1992) (quoting *Lanear v. Safeway Grocery*, 843 F.2d 298, 301 (8th Cir.1988)); *see also Lynn*, 160 F.3d at 487–88 (citing *Harvey v. Anheuser–Busch, Inc.*, 38 F.3d 968, 972 (8th Cir. 1994)). Under this approach, the ultimate determination of whether "employees are 'similarly situated' to warrant a comparison to a plaintiff is a 'rigorous' one." *Palesch v. Missouri Comm'n on Human Rights*, 233 F.3d 560, 568 (8th Cir.2000) (citing *Harvey*, 38 F.3d at 972).

██ Historically, the Eighth Circuit routinely applied the rigorous "similarly-situated" standard to its review of summary judgment motions in employment discrimination cases. In 2005, however, the Court noted that another line of cases has applied a "low threshold" standard for employees to be considered similarly-situated at the prima facie stage of the *McDonnell Douglas* burden-shifting analysis. *See Rodgers v. U.S. Bank*, 417 F.3d 845, 852 (8th Cir.2005). This "low threshold" standard requires at the prima facie stage only that "employees 'are involved in or accused of the same or similar conduct and are disciplined in different ways.' " *Id.* at 851 (citing *Wheeler v. Aventis Pharms.*, 360 F.3d 853, 857 (8th Cir.2004)). Noting the conflicting lines of cases, the *Rodgers* Court chose "to follow the low-threshold standard for determining whether employees are similarly situated" at the prima facie stage of analysis. *Id.* at 852.

The conflict identified in *Rodgers* remains unresolved. Indeed, since *Rodgers*, Eighth Circuit panels continue to apply the rigorous test at both the prima facie and the pretext stages of the analysis. *See, e.g., Fields v. Shelter Mut. Ins. Co.*, 520 F.3d 859, 864 (8th Cir.2008) (finding that the test for similarly situated at the prima facie stage "is rigorous and requires that the other employee be similarly situated in all relevant respects"). In light of the fact that the "rigorous" standard is indisputably the applicable standard of review at the third stage of the *McDonnell Douglas* analysis, the Court will adopt the low threshold standard at the prima facie stage. The distinction is largely academic, however, because even assuming that each Plaintiff can prove as part of their prima facie case that female employees were involved in or accused of the same or similar conduct but were disciplined in different ways, each Plaintiff would nonetheless be obligated to satisfy the more "rigorous" standard applicable to the similarly situated analysis at the "pretext" phase of the *McDonnell Douglas* analysis.[27] *See*

---

**27.** Plaintiffs argue that State Defendants have failed to proffer a legitimate nondiscriminatory reason for imposing disciplinary action on them, such that the burden never shifts back to Plaintiffs to prove that State Defendants' legitimate nondiscriminatory reason for its employment actions is merely pretext for discrimination. The Court disagrees. First, the Court believes that State Defendants *have*, in fact, stated a legitimate nondiscriminatory reason for imposing disciplinary action on Plaintiffs. *See* State Defs.' Mot. for Summ. J.

*Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 142, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (" 'The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.' ") (quoting *Burdine,* 450 U.S. at 253, 101 S.Ct. 1089).

 As noted, to satisfy the "rigorous" similarly situated standard at the pretext stage of the analysis, Plaintiffs must demonstrate that female comparators were "similarly situated in all relevant respects." *Rodgers,* 417 F.3d at 853. The Eighth Circuit Court of Appeals has identified several factors to be considered when evaluating whether employees are similarly situated to one another: "[T]he individuals used for comparison must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." *Clark,* 218 F.3d at 918 (citing *Lynn,* 160 F.3d at 487–88). Moreover, "to be probative evidence of pretext, the misconduct of more leniently disciplined employees must be of 'comparable seriousness.' " *Rodgers,* 417 F.3d at 853 (quoting

Harvey, 38 F.3d at 972 (other citations and quotations omitted)).

Plaintiffs identify several female employees of NCF that they contend committed the same or similar conduct as Plaintiffs, but that were disciplined in different ways. First, Plaintiffs point out that Klubek complained to Scheffert–James about several staff members other than Plaintiffs, namely Cline, Slykhuis, and Miller, but that it was only the Plaintiffs' conduct that was investigated and that led to disciplinary action. Next, Plaintiffs identify NCF employees Jane Doe 1, Jane Doe 2, and Jane Doe 3 as similarly situated females.

### a. *Julie Cline, Lynn Slykhuis, and Brenda Miller.*

 NCF policies require an investigation into violations of IDOC policies and procedures. *See* Pls.' State App. at 214 (Policy and Standards of IDOC providing: "Management has the responsibility to enforce policies and procedures to assure a safe and secure environment. Investigations arising from alleged policy or procedure violations will be conducted objectively and fairly while respecting employee

at 1 ("The three Plaintiffs were initially suspended without pay as a result of the finding of the investigation."), 2 ("Judgment on behalf of the State Defendants is ... mandated with respect to the § 1983 claims because ... any action that was taken was not based, in whole or in part, on Plaintiffs' sex but on a reasonable belief that they had engaged in misconduct, as reported by Klubek and Reynolds."). Second, even assuming that State Defendants had not explicitly articulated a legitimate, nondiscriminatory reason for suspending Plaintiffs without pay, the burden of production applicable at the second stage of the *McDonnell Douglas* analysis requires only that a defendant produce *"evidence* (whether ultimately persuasive or not) of nondiscriminatory reasons" for its adverse employment decisions. *St. Mary's Honor Ctr.,* 509 U.S. at 509, 113 S.Ct. 2742 (emphasis in original). Here, State Defendants have maintained at all

times that "disciplinary actions were invoked against [Plaintiffs] because they were accused of sexual harassment," State Defs.' Reply at 9, and because the investigation into those accusations led NCF officials to believe that the Plaintiffs had actually engaged in sexual harassment. *See, e.g.,* State Defs.' App. at 111A (Warden Mapes testifying at deposition that in considering disciplinary action against Plaintiffs, both he and the Executive Team believed that the inappropriate conversations Plaintiffs were accused of participating in actually occurred); State Defs.' Supp.App. at 9 (Kris Weitzell testifying at deposition that she believed the conduct of Marsh and Davis warranted termination, and that Kent's conduct warranted some lesser disciplinary action because "the behavior reported to me was so egregious and violated a no-tolerance sexual harassment policy").

rights. Investigations will begin as soon as practical, or when management becomes aware of the alleged violation, and will be concluded without unreasonable or unnecessary delays."). State Defendants point out that Plaintiffs were disciplined under NCF policy O.M. 3–7, paragraphs 4, 24, and 30, each of which is a policy against general harassment or horseplay. Plaintiffs contend that State Defendants' failure to investigate the actions of Cline, Slykhuis, and Miller under the same general harassment policies demonstrates that State Defendants treated similarly situated females more favorably than Plaintiffs.

Though the bulk of Scheffert–James' e-mail to Warden Mapes focused on the inappropriateness of the sexual comments made in Klubek's presence, the e-mail did also mention Klubek's complaint that her desk had been searched [Julie Cline] and also noted that Reynolds had told her that "the computer person, Brenda Miller, and the Educational Instructor [Lynn Slykhuis] were all difficulties for Ms. Klubek." State Defs.' App. at 2. During White's investigation, both Klubek and Reynolds identified several conflicts Klubek had with Cline, Slykhuis, and Miller.

Regarding Cline, Klubek told White that Cline had searched her desk, but that the "situation is resolved." State Defs.' App. at 47A. Reynolds also stated that Cline had searched Klubek's desk. State Defs.' App. at 26. Reynolds further stated that Klubek had told her that "Julie Cline told her she wanted to kill her." *Id.* at 30. Reynolds believed the incident happened because Klubek was crying when she told Reynolds about it.[28] *Id.* Reynolds went on to state that Cline "has made every possible interference in what we're trying to get accomplished here and makes things very

difficult for us to get things accomplished and has been incredibly rude to me . . . very disrespectful." *Id.*

With regard to Miller, Klubek told White that she had a conflict with Miller regarding attendance at training sessions. *Id.* at 50A. Klubek claims that Miller told her that the training was flexible, but then reported Klubek to Nancy Kucera and to Warden Mapes when Klubek was unable to work a particular training session into her schedule. *Id.* The matter concluded with an official memo being issued stating that Klubek had declined to participate in training. *Id.* at 50A. Klubek told White that the memo "basically [ ] said I was being uncooperative and that was fine and that was all that ever happened with it." *Id.* Klubek stated that after this incident, "all of a sudden there was this barrage of other training that I had to go to." *Id.* at 50B.

With regard to Slykhuis, Klubek told White: "[S]he doesn't talk to me. She turns me in to security. There's been issues with sharing the room. There was a huge issue in that computer lab that a bunch of miscommunication . . . that's been an ongoing, I mean, there's not just one issue there it's a variety . . . no sexual nothing like that." *Id.* at 50C. Reynolds told White that Slykhuis, a DMACC employee, had a goal to get Klubek out of NCF "because [Slykhuis] views [Klubek] as a risk and that [Slykhuis] wants to be part of the team that walks her out." *Id.* at 30.

Even assuming that Cline, Slykhuis, and Miller's alleged misconduct is the same or sufficiently similar to the allegations against Plaintiffs to make them similarly situated for purposes of the prima

---

**28.** Klubek denies that she was crying when she told Reynolds about Cline's comments. DMACC Defs.' App. at 82 (Q. "Were you crying during a conversation with Sherri Reynolds about Julie Cline? A. No. Q. Even when you told Sherri Reynolds that Julie Cline wanted to kill you? A. I did not cry.").

facie stage of the analysis, it is clear that none of the three are similarly situated to Plaintiffs for purposes of the third "pretext" stage of the analysis. The investigation into the conduct of Kent, Davis, and Marsh stemmed from allegations that each participated in sexually based conversations in the workplace, in front of Klubek, who found such conversations offensive, conduct that could arguably deemed sexual harassment. In stark contrast, Klubek's reported conflicts with Cline, Slykhuis, and Miller contained no allegations of sexually based conduct, i.e., Cline, Slykhuis, and Miller were never accused of any conduct that could arguably be considered sexual harassment, even though their actions conceivably could have been violations of the same NCF policies Plaintiffs were accused of violating. *See Wright v. Murray Guard, Inc.*, 455 F.3d 702, 710 (6th Cir. 2006) (finding that an employee who allowed an unauthorized person into a work facility and who spread rumors was not similarly situated to an employee accused of sexual harassment because "their alleged acts of misconduct are of a very different nature"). The alleged misconduct of Cline, Slykhuis, and Miller is of the type frequently encountered in everyday interactions between coworkers, whereas the alleged misconduct of Plaintiffs is of the type that could subject NCF to substantial legal liability if not promptly and appropriately investigated. The distinction is determinative because an employer bears an affirmative obligation to investigate sexual harassment and to take "prompt remedial action reasonably calculated to end" it. *Bailey v. Runyon*, 167 F.3d 466, 468–69 (8th Cir.1999); *see also Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) ("Title VII affords employees the right to work in an environment free from discriminatory intimidation, ridicule, and insult."); *Malik v. Carrier Corp.*, 202 F.3d 97, 105–06 (2d Cir.2000) ("[A]n employer's investigation of a sexual harassment complaint is not a gratuitous or optional undertaking...."). Employers bear no such legal obligation with regard to lesser complaints such as those against Cline, Slykhuis, and Miller.

■ Plaintiffs argue that the legal obligation to investigate certain claims of misconduct "ignores [NCF] policy and the testimony of individual Defendants," namely Warden Mapes' deposition testimony "admit[ting] that there should have been an investigation of Julie Cline and Lynn Slyhuis's conduct." Pls.' State Br. at 32. Even accepting as true Plaintiffs' contention that Warden Mapes believed that Cline's and Slykhuis' conduct should have been investigated, that fact does not make either Cline or Slykhuis "similarly situated" to Plaintiffs. Indeed, even if Cline, Slykhuis, and Miller's conduct should have been investigated pursuant to NCF or IDOC policies or procedures, their alleged misconduct is much less serious than Plaintiffs' alleged misconduct. Employers are permitted to prioritize their investigations, giving greater emphasis and attention to more serious allegations of misconduct. A contrary conclusion would be patently unreasonable, as it would overwhelm employers with an obligation to investigate even the most minor rule violations with the same vigor and resources as major rule violations. Accordingly, the Court finds that Plaintiffs have not demonstrated that Cline, Slykhuis, and Miller are similarly situated comparators because their alleged misconduct was not of comparable seriousness to the Plaintiffs' alleged misconduct.[29]

29. Additional differences prohibit a finding that Cline, Slykhuis, and Miller are similarly situated to Plaintiffs. First, the females alleged to be similarly situated to Plaintiffs have different job positions than Plaintiffs. *See, e.g., Smith v. Eaton Corp.*, 195 F.Supp.2d 1079, 1094 (N.D.Iowa 2002) (finding that a plaintiff failed to show coworkers were simi-

b. *Jane Doe 1.*

█ Plaintiffs next contend that Jane Doe 1 ("Doe 1") is a similarly situated comparator. Pls.' State Br. at 33–34. Plaintiffs contend that Doe 1 was disciplined on May 23, 2005 for making a joke and gestures that were of a sexual nature. The only document in the record relating to this incident indicates Doe 1 received a one-day suspension without pay for a situation where Doe 1 was talking with two other correctional officers. *See* Pls.' State App. at 232. Doe 1 "told them a joke and made gestures during the telling of the joke that were of a sexual nature. This joke was about another employee of NCF." *Id.* Doe 1 admitted that she had heard the joke from an inmate, repeated the joke to the two other staff members, and admitted that her conduct was not professional. *Id.* She was disciplined for violating NCF policy O.M. 3–7(4), (19) ("Employees will refrain from discussion or reflecting on the character or functioning of any other employee . . . ."), and (24). On November 21, 2006, Doe 1 received a three-day suspension without pay [30] for vi-

---

larly situated where the plaintiff and the co-workers "did not perform the same job," amongst other things). Kent and Davis are both correctional counselors at NCF, while Marsh is a psychologist. While it is not entirely clear in the record, it appears that Cline is with the computer department at NCF, while Slykhuis is not even employed directly by NCF. *See* State Defs.' App. at 110B (Warden Mapes referencing Cline as "our I.T. person" at deposition); 30 (Sherri Reynolds stating that "Lynn Slykhuis . . . is a DMACC employee actually"). The Court is uncertain of Miller's role at NCF, but it does not appear that she is either a correctional counselor or a psychologist.

Moreover, with regard to the allegation that Cline "searched" Klubek's desk, there is absolutely no indication in the record that such an action would constitute a violation of any NCF policy. Indeed, Klubek herself told White that the desk search "situation is resolved," making it questionable why further investigation should have been necessary. State Defs.' App. at 47A.

With regard to Cline telling Klubek that she wanted to kill her, this information was relayed to White by Reynolds, not by Klubek. Despite Plaintiffs' efforts to characterize Cline's comment as "a death threat" that is far more serious than Plaintiffs' conduct, Klubek stated at deposition that Cline made the comment to Conn and that Conn told Klubek, who in turn told Reynolds that "Cindy told me that Julie wants to kill me." Pls.' State App. at 23. Klubek later testified at deposition that Conn never told her whether the comment was made literally or figuratively, but that she didn't "think [Cline] really wanted to kill me. I think she didn't like me, and . . . she wished I probably wasn't at the correctional facility complicating her life." DMACC Defs.' App. at 83. The Court questions whether NCF was obligated, even by its own policies, to take seriously a "death threat" that was not even taken seriously by its purported "victim" and that only came to NCF's attention through double hearsay.

Likewise, the Court questions whether an investigation of either Miller or Slykhuis was required by NCF's policies. The only allegation against Miller is that she reported Klubek for not participating in training and then required her to participate in more training. Apparently Slykhuis and Klubek had conflicts, but the information known to NCF about those conflicts is vague and undefined at best. *See* State Defs.' App. at 50C (recounting conflicts such as "miscommunications" and "she doesn't talk to me"). Indeed, the allegations against Slykhuis are nebulous comments such as: "[S]he doesn't talk to me" and "She turns me into security." There is no clear indication in the record that even Klubek viewed Miller's or Slykhuis' conduct as "harassment" under the NCF policies, making it unclear why NCF should have launched a full-scale investigation.

30. Plaintiffs' Brief states that Doe 1 received a three day suspension without pay. Pls.' State Br. at 34. Doe 1's November 21, 2006 disciplinary letter states that she was "receiving a 24 hour [ ] suspension (without pay)." Pls.' State App. at 235. It appears, however, that Doe 1's punishment was actually a three-day suspension because the disciplinary letter goes on to state that Doe 1's suspension will "begin on November 29th through part of the shift December 1 st, 2006." *Id.*

olating AD–PR–11 (NCF–02), Section II, Subsections A4, C1, C3, and C7. Doe 1's disciplinary letter states:

> [Senior Correctional Officer] Doe 1 was involved in an inappropriate discussion with a staff member pertaining to another Senior Correctional Officer and a Correctional Trades Leader allegedly having an affair. This discussion led to a rumor being spread, and the spouses of the above mentioned SCO and CTL were informed about it through gossip. Ultimately, a Discriminatory Harassment Complaint was filed resulting in this investigation. SCO Doe 1 repeatedly made statements throughout this investigation that were found to be deceptive and/or not completely truthful.

Pls.' State App. at 234.

State Defendants first argue that Doe 1 is not similarly situated to Plaintiffs on the basis that "Plaintiffs offer no evidence of first-hand knowledge of the conduct of these females." State Defs.' Reply at 6. State Defendants cite *Oakley v. Cowan* in support of the proposition that a lack a evidence of first-hand knowledge is sufficient to warrant summary judgment. 187 Fed.Appx. 635 (7th Cir.2006). The facts of *Oakley* are readily distinguishable from the present case, however. In *Oakley*, the only evidence of alleged misconduct by the named comparators was Oakley's own say-so.[31] Here, in contrast, the evidence of Doe 1's misconduct is plainly articulated in the official letters of reprimand, which cited the basis of the complaints against Doe 1, the findings of the investigation into those complaints, the rules Doe 1's conduct was found to have violated, and the disciplinary action imposed. Moreover, Doe 1's conduct could arguably be deemed a type of sexual harassment similar to the conduct of which Plaintiffs were accused. Accordingly, the Court finds that Plaintiffs have established Doe 1 as a similarly situated comparator for purposes of their prima facie case.

On the more rigorous pretext analysis, however, the Court finds that Plaintiffs have failed to demonstrate that Doe 1 is similarly situated. First, Plaintiffs have offered no evidence that Doe 1's position as a "Senior Corrections Officer" was comparable to Plaintiffs' positions of "Correctional Counselor" (Kent and Davis) or "Psychologist" (Marsh). Second, and more compelling, is the fact that each of the Plaintiffs had their suspensions rescinded and were awarded back pay and benefits. There is no indication in the record that Doe 1 had her suspensions rescinded or that she received back pay after her suspensions were served. This factor distinguishes Doe 1's discipline from that of Plaintiffs because, in considering *all* of the relevant mitigating and distinguishing circumstances, it appears that Doe 1 was ultimately disciplined *more* severely than any of the three Plaintiffs for her similar conduct.

---

**31.** In *Oakley,* the plaintiff, a male corrections officer, was terminated after he was alleged to have grabbed the breasts and buttocks of a female corrections officer. 187 Fed.Appx. at 636–37. The district court granted summary judgment in favor of the defendant, concluding that the plaintiff had presented no evidence of discrimination. *Id.* On appeal, the plaintiff argued that the defendants had terminated him even though they did not terminate female employees who engaged in "far more significant" acts of sexual harassment. *Id.* at 637–38. The Seventh Circuit rejected the plaintiff's claims, finding that "Mr. Oakley has presented no admissible evidence that any female employees actually had engaged in sexual harassment or, if they had, that their behavior was reported up the chain of command." *Id.* In fact, the only evidence Oakley offered of misconduct by the female officers was "his own deposition testimony, and [with one exception that Oakley had first had knowledge of, but didn't report] his knowledge was admittedly limited to second-hand accounts and unsubstantiated rumors." *Id.*

#### c. *Jane Doe 2.*

 Plaintiffs next point to Jane Doe 2 ("Doe 2") as being similarly situated to Plaintiffs. Plaintiffs claim that their "understanding of [the Doe 2] situation was that Doe 2 made up a sexually harassing song about another officer ... that compared [the officer's] first name to a portion for the female anatomy." Pls.' State Br. at 36. Warden Mapes testified at deposition that Doe 2 had actually made a comment that the other correctional officer's husband must feel "like [he was having] sex with a boy, a little boy" because of the officer's diminutive size. Pls.' State App. at 62. When the incident was reported to NCF, Doe 2 and two male employees that were also involved in the incident received corrective action in the form of a "coach and counsel." *Id.*

Doe 2 is not similarly situated to Plaintiffs under either the "low threshold" or the "rigorous" test. First, there is no evidence in the record that Doe 2 held a similar position or had comparable job responsibilities to either of the Plaintiffs. Second, Doe 2 was disciplined along with two males, each of whom received precisely the same punishment as she did, undermining any notion of a discriminatory bias in favor of females. Finally, as was the case with Doe 1, there is no evidence in the record that Doe 2's "coach and counsel" discipline was ever removed from her record or rescinded in any way, as was the case with Plaintiffs. Accordingly, the Court finds that Doe 2 is not similarly situated to Plaintiffs.

#### d. *Jane Doe 3.*

 Plaintiffs assert that Jane Doe 3 ("Doe 3") is similarly situated to Plaintiffs. According to Plaintiffs, Doe 3 made a comment that she "should have taken care of [another NCF employee] at the gun range." Pls.' State Br. at 37. According to Warden Mapes, no formal investigation was conducted, but Doe 3 "was not allowed to go to the [gun] range that day." Pls.' State App. at 50. The situation between Doe 3 and the other NCF employee "was part of an ongoing battle that was taking place between two staff members," according to Mapes, and at some point the matter got turned over to the to state Attorney General's office, though Mapes was unsure of what, if any, discipline resulted. *Id.*

Doe 3 is not similarly situated to Plaintiffs under either the "low threshold" or the "rigorous" analysis. There is no evidence in the record regarding the comparability of Doe 3's position at NCF to that of Plaintiffs. There is no evidence regarding any discipline actually imposed on Doe 3 arising out of the incident, meaning that no reasonable comparison can be made between Doe 3's and the Plaintiffs' punishments. Most significantly, a non-sexual comment such as Doe 3's, while serious, is not sufficiently similar to the allegations of sexual harassment lodged against the Plaintiffs to satisfy the requirement that female comparators be "similarly situated."

#### e. *Female employees generally.*

 Finally, Plaintiffs contend that similarly situated female comparators are evidenced by the fact that female employees who posted inappropriate pictures to the IDOC's intranet for Warden Mapes' birthday received only "coaching and counseling" as a punishment. Pls.' State Br. at 37. Plaintiffs point out that a male employee involved in the same incident "got a written reprimand." *Id.* Again, the female comparators are not similarly situated to Plaintiffs for purposes of either the low threshold or the rigorous analysis. Plaintiffs have offered absolutely no information regarding the actual content of the "inappropriate" birthday signs, making it impossible to determine whether the female

employees at issue engaged in the same or similar behavior as Plaintiffs. This complete lack of specific information regarding the incident, alone, warrants the conclusion that the alleged comparators are not similarly situated to Plaintiffs.[32]

### 3. Have Plaintiffs shown adequate "background circumstances"?

■ Because the Plaintiffs in the present case are male, they bear the additional burden of demonstrating as part of their prima facie case that "background circumstances support the suspicion that the defendant is that unusual employer who discriminates against the majority." *Duffy,* 123 F.3d at 1036 (citations omitted). Plaintiffs can meet this burden by demonstrating that State Defendants "are inclined to discriminate invidiously against males" or by showing "something 'fishy' about the facts that raises an inference of discrimination." *Woods v. Perry,* 375 F.3d 671, 673–74 (8th Cir.2004) (quoting *Harding v. Gray,* 9 F.3d 150, 153 (D.C.Cir. 1993)).

While Plaintiffs do not directly address this element of the prima facie case, their arguments on the question of whether similarly situated females are treated more favorably can be deemed equally applicable to the reverse discrimination element. To the extent that the Court has determined that none of the female comparators identified by Plaintiffs are similarly situated, the Court also finds that Plaintiffs' evidence regarding female comparators does not give rise to an inference of reverse gender discrimination by State Defendants.

■ In addition to their arguments about female comparators, Plaintiffs attempt to raise the specter of discrimination by pointing out that a "statistical analysis of the suspensions meted out at NCF demonstrates that male employees serve longer suspensions than female employees." Pls.' State Br. at 39. Plaintiffs argue that this statistical analysis serves as evidence of the State Defendants' discriminatory animus toward males. Plaintiffs place far too much reliance on these generalized statistics, however. Plaintiffs' statistical averages do not demonstrate that "similarly situated employees outside the protected class were treated more favorably," nor do they support an inference that something "fishy" is going on at NCF regarding the treatment of males versus females. *See Schoffstall,* 223 F.3d at 825. Indeed, merely pointing out that females, on average, receive shorter suspensions than males offers nothing to aid the Court's analysis because the numbers offered by Plaintiffs do not account for the the precise details of the incidents, prior incidences of misconduct by the alleged offenders, or for grievance settlements that might have awarded back pay and reinstatement to those suspended, amongst other things. Accordingly, the Court finds that Plaintiffs have not established this element of their prima facie case.

### C. Equal Protection

Plaintiffs' Complaints each allege that State Defendants,[33] while acting in their official capacities, deprived the Plaintiffs of equal protection under the law by virtue of

---

**32.** State Defendants point out that the male who received a reprimand in the incident was Warden Mapes himself, who received a reprimand from IDOC, an entity outside NCF. State Defendants also point out that, in contrast to Klubek's stated offense at Plaintiffs' conduct, Warden Mapes was not offended by the birthday signage, and there is no evidence in the record that anyone else was offended by it either.

**33.** All Plaintiffs name State Defendants Van Gorp, Boggess, Weitzell, and White. Kent and Davis additionally name State Defendants Mapes and Lipscomb. Davis also names State Defendant Scott Miller.

gender discrimination. Kent Compl. ¶ 37; Davis Compl. ¶ 28; Marsh Compl. ¶ 28. Plaintiffs concede that Weitzell, Van Gorp, Lipscomb, and Boggess are entitled to summary judgment on the equal protection claim. Accordingly, the claim remains only against State Defendants White, Mapes, and Scott Miller.

■■■■ Title 42, United States Code, § 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

42 U.S.C. § 1983. "Section 1983 establishes no substantive rights but is merely the vehicle for seeking a federal remedy for violations of federally protected rights." *Greenwood v. Ross,* 778 F.2d 448, 454 (8th Cir.1985) (citing *Irby v. Sullivan,* 737 F.2d 1418, 1427–28 (5th Cir.1984)). "The Constitution and federal statutes define the substantive rights which may be asserted in § 1983 actions." *Id.*

■■■■ The prima facie case Plaintiffs must prove in order to succeed on their claims of denial of equal protection under § 1983 is the same as the prima facie case under Title VII, subject to the same *McDonnell Douglas* burden shifting analysis. *See Tipler v. Douglas County, Neb.,* 482 F.3d 1023, 1027 (8th Cir.2007) ("The analysis is similar when a plaintiff alleges both Title VII and § 1983 claims based on a violation of equal protection."); *Hicks v. St. Mary's Honor Ctr.,* 970 F.2d 487, 490–91 (8th Cir.1992) ("We agree with the district court that the elements of plaintiff's [§ 1983] claim . . . are the same as those

which he must prove . . . under Title VII."), *rev'd on other grounds,* 509 U.S. at 506 n. 1, 113 S.Ct. 2742. Accordingly, Plaintiffs' equal protection claims fail for the same reasons their Title VII claims fail, namely, they have not presented evidence sufficient to establish that they suffered an adverse employment action, and they have not identified similarly situated comparators that were treated more favorably by the State Defendants with regard to disciplinary actions. *See Klinger v. Dep't of Corr.,* 31 F.3d 727, 731 (8th Cir. 1994) ("Absent a threshold showing that [plaintiff] is similarly situated to those who allegedly receive favorable treatment, the plaintiff does not have a viable equal protection claim.").

■■■■ Plaintiffs' § 1983 claims also fails against White and Scott Miller because Plaintiffs have not demonstrated that either White or Scott Miller was directly responsible for any alleged deprivation of rights. " 'Liability under section 1983 requires a causal link to, and direct responsibility for, the deprivation of rights.' " *Mayorga v. Missouri,* 442 F.3d 1128, 1132 (8th Cir.2006) (quoting *Madewell v. Roberts,* 909 F.2d 1203, 1208 (8th Cir.1990)). Plaintiffs' own statement of undisputed facts contends that it is "[W]arden [Mapes who] makes the ultimate decision concerning discipline." Pls.' State Facts ¶ 1. Plaintiffs attempt to circumvent the fact that White and Scott Miller had no actual responsibility for imposing discipline by arguing that "Plaintiffs' case is really based on the fact that the Defendants investigate and discipline male and female employees inconsistently . . . [as] demonstrated by the fact that the Defendants investigated and disciplined the Plaintiffs for general harassment and general civility violations, but failed to investigate the female employees that Klubek claimed were involved in conduct that violated the same

policies." Pls.' State Br. at 43. As noted above, however, the female employees with whom Klubek had conflicts (as specified in the Scheffert–James e-mail) were not similarly situated because the nature of the reported conduct was not sexual. Indeed, Plaintiffs' argument in this regard wholly ignores the actual *conduct* in which Plaintiffs were accused of engaging. *See Rodgers,* 417 F.3d at 851 (finding that "similarly situated" employees are those "involved in or accused of the *same or similar conduct* and disciplined in different ways" (citations omitted, emphasis added)). No doubt, countless *types* of conduct could be considered in violation of NCF's broad harassment and civility policies, but not all types of conduct are equal. Here, Plaintiffs were accused of violations that, if substantiated, could be deemed tantamount to sexual harassment, whereas the alleged violations of female employees were not.

### D. *State Law Tort Claims*

All three Plaintiffs asserts a claim of Slander against Weitzell, Conn, Klubek, and Reynolds. Marsh and Davis also assert the claim against DMACC. The allegation in all three Complaints is that the named Defendants, acting "outside the scope of any employment as a state agent," "made statements to third persons concerning the Plaintiff's alleged participation in sexually harassing conversations at the Newton Correctional Facility." Kent Compl. ¶¶ 43, 45; Davis Compl. ¶¶ 34, 36; Marsh Compl. ¶¶ 34, 36.

Each Plaintiff also asserts a claim of Intentional Interference with a Contract against DMACC, Weitzell, Conn, Klubek, and Reynolds. The allegation in all three Complaints is that the named Defendants, acting "outside the scope of any employment as a state agent," "intentionally and improperly interfered with the contract by

making statements to third persons concerning the Plaintiff's discipline including the reasons for the suspension and her attitude about terminating the Plaintiff." Kent Compl. ¶¶ 49, 52; Davis Compl. ¶¶ 40, 43; Marsh Compl. ¶¶ 40, 43. Plaintiffs concede DMACC Defendants' Motion for Summary Judgment should be granted with respect to the intentional interference with contract claims because the "evidence demonstrates that Klubek and Reynolds made their defamatory statements for purposes of protecting themselves and the DMACC programs as opposed to in an attempt to interfere with the Plaintiffs' contracts with NCF." Pls.' DMACC Br. at 21. Accordingly, the DMACC Defendants' Motion for Summary Judgment on Plaintiffs' claims of intentional interference with a contract is granted.

#### 1. *State Defendants' claim of Eleventh Amendment immunity from Plaintiffs' state law tort claims.*

■ State Defendants contend that they are immune from liability from Plaintiffs' state law tort claims under the Eleventh Amendment. On the face of Plaintiffs' Complaints, this assertion is without merit.[34] As noted, Plaintiffs have specifically sued the State Defendants in their individual capacities for slander and intentional interference with contract. Moreover, Plaintiffs contend that State Defendants' tortious conduct for purposes of both claims occurred "outside the scope of any employment as a state agent." The Eleventh Amendment is inapplicable to claims against state employees sued in their individual capacity. *See Hafer v. Melo,* 502 U.S. 21, 30–31, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991).

---

**34.** The Court discusses the actual evidence in the record regarding scope of employment in the following section, regarding immunity under the ITCA.

## 2. State Defendants' claim of immunity under the Iowa Tort Claims Act for Plaintiffs' state law tort claims.

State Defendants next argue that Plaintiffs' state law tort claims must be dismissed under the Iowa Tort Claims Act ("ITCA"). *See* Iowa Code § 669.1 et seq. Specifically, State Defendants argue that the Iowa Attorney General has certified that both Conn and Weitzell were acting within the scope of their offices or employment at the time of the alleged torts, that Iowa Code § 669.5(2)(a), therefore, converts Plaintiffs' claims into claims against the state, and that Plaintiffs' claims against the state are barred by the Eleventh Amendment and by Plaintiffs' failure to perfect their tort claims by first filing them with the state appeal board as required by the ITCA. *See* State Defs.' Br. at 24–26.

 Iowa Code § 669.5(2)(a) provides: Upon certification by the attorney general that a defendant in a suit was an employee of the state acting within the scope of the employee's office or employment at the time of the incident upon which the claim is based, the suit commenced upon the claim shall be deemed to be an action against the state under the provisions of this chapter, and if the state is not already a defendant, the state shall be substituted as the defendant in place of the employee.

The Iowa Supreme Court recently determined that the attorney general certification provision in § 669.5(2)(a) "does not apply retrospectively" to acts occurring before its effective date of July 1, 2006. *Iowa Beta Chapter of Phi Delta Theta Fraternity v. State of Iowa,* 763 N.W.2d 250, 265–66 (Iowa 2009). Since the tortious acts alleged in this case occurred entirely during the investigation in June and July 2005, the certification provision in § 669.5(2)(a) is inapplicable.[35]

 Regardless of the applicability of § 669.5(2)(a), State Defendants' certification places squarely in contention the question of whether State Defendants were acting outside the scope of their employment. This issue warrants some additional discussion, at least with regard to State Defendant Conn.[36] Under Iowa law, " 'the question of whether an act is within the scope of employment is ordinarily a jury question.' " *Godar v. Edwards,* 588 N.W.2d 701, 705 (Iowa 1999) (quoting *Sandman v. Hagan,* 261 Iowa 560, 154 N.W.2d 113, 118 (1967)). " '[D]epending

---

**35.** Since the Court has determined that the Attorney General's certification is inapplicable because the present action arose before the effective date of the provision, State Defendants' corollary arguments under the ITCA must also fail. *See* State Defs.' Br. at 26–27 (asserting that Plaintiffs did not properly perfect their state tort claims under the ITCA, that Plaintiffs' state tort claims are barred under the ITCA as actually being against the State, and that the Attorney General's certification means that the State is substituted for Conn and Weitzell in the present action such that Plaintiffs' claims of intentional interference with a contract must fail because the State cannot interfere with a contract to which it is a party).

**36.** The time, place, and manner of Conn's alleged tortious conduct is readily apparent in the record, making an evaluation of whether her acts occurred within the scope of her employment appropriate. There is no information in the record regarding the time, place, or manner of Weitzell's alleged statements regarding her desire that Plaintiffs be terminated, however, making evaluation of whether Weitzell's statements occurred within the scope of her employment impossible. Moreover, the question of whether Weitzell was acting within the scope of her employment at the time of her allegedly tortious statements is moot in light of the Court's conclusion, discussed *infra,* that the defamation and intentional interference with contract claims against Weitzell fail for lack of evidence.

on the surrounding facts and circumstances,'" however, "'the question as to whether the act which departs markedly from the employer's business is still within the scope of employment may well be for the court.'" *Id.* (quoting *Sandman*, 154 N.W.2d at 118). Plaintiffs contend that the "conduct [they] complain about in this action is outside the scope of a public official's employment because the conduct would be actionable regardless of whether the individual defendant was a state employee."[37] Pls.' State Br. at 47. Plaintiffs offer no legal citation in support of the proposition that a state employee would be individually liable for actions taken within the scope of their employment merely because such person would be liable for those actions if he or she was not a state employee. Indeed, Plaintiffs' position in this regard is untenable, because it would render the immunity from liability under the ITCA for state employees acting within the scope of their employment wholly superfluous.

 "The doctrine of sovereign immunity dictates that a tort claim against the state or an employee acting within the scope of his office or employment with the state must be brought, if at all, pursuant to chapter 669." *Dickerson v. Mertz*, 547 N.W.2d 208, 213 (Iowa 1996). Iowa Code § 669.23 provides: "Employees of the state are not personally liable for any claim which is exempted under [Iowa Code] section 669.14." In addition, § 669.14 provides that the State's waiver of sovereign immunity from tort claims in section 669.4 does not apply to certain types of claims, including: "[a]ny claim arising out of assault, battery, false impris-

onment, false arrest, malicious prosecution, abuse of process, libel, *slander*, misrepresentation, deceit, or *interference with contract rights*." (emphasis added).

The ITCA defines the phrase "acting within the scope of the employee's office or employment" as "acting in the employee's line of duty as an employee of the state." Iowa Code § 669.2(1). Plaintiffs allege in their Complaints that Conn was acting "outside the scope" of her state employment when she made statements to White regarding the investigation of Plaintiffs. Upon examination of the record, however, the Court cannot agree. The Iowa Department of Corrections Policy and Standards provides:

> Employees must cooperate in an investigation by fully and truthfully answering any job-related questions. If the employee refuses to answer, the employee should be informed that such failure is considered insubordination and may lead to discipline.... If the above warnings are given, employees are required to fully answer questions relating to job performance of his/her job or any off duty conduct related to the job.

Pls.' State App. at 215. Accordingly, at the commencement of both of his interviews with Conn, White informed Conn that "It's NCF policy you cooperate with any and all investigations. Any statement you make whether it be oral or written shall be truthful in nature. Do you understand that?" Pls.' State App. at 126, 132. Conn replied in both instances that she understood and then answered White's questions. *Id.*

---

**37.** Plaintiffs contend that Defendants "do not attack the merits" of the issue of whether State Defendants were acting within or outside the scope of their employment. The issue is in contention, however, by virtue of the fact that State Defendants have offered a cer-

tification that all State Defendants "were acting within the scope of their employment as employees of the State of Iowa at all times relevant to this action." State Defs.' App. at 67.

■ Given that the clear and undisputed evidence in the record demonstrates that Conn was obligated by state policies and the terms of her employment to fully cooperate with White's investigation into Plaintiffs' conduct, it is apparent that Conn was, at the time she made the statements that form the basis of Plaintiffs' tort claims, acting within the scope of her employment with NCF and the State. Accordingly, Conn is entitled to immunity from Plaintiffs' slander and intentional interference with contract claims under §§ 669.14 and 669.23 of the ITCA, notwithstanding Plaintiffs' allegations that she was acting outside the scope of her employment.

3. *State Defendants' request for summary judgment on the defamation claim against Weitzell.*[38]

■ Plaintiffs defamation claim against Weitzell is ill-defined at best. It appears that Plaintiffs base their claims on the allegations that "Weitzell spread rumors about the Plaintiffs and told staff members that she wanted the Plaintiffs fired." Pls.' State Facts ¶ 63. In support of this assertion, Plaintiffs cite the following testimony:

* The deposition of Steven Squires, wherein Squires states that he had a conversation with an individual named Janice Berry, and "Janice made the statement that Kris [Weitzell] had told her that Kris was passionate about terminating Jim Davis and Joe Kent." Pls.' State App. at 90. Squire could not "recall specifically if Marty Marsh was mentioned." *Id.*

* Kent's Deposition testimony wherein he states, referencing Weitzell, "[it] was also spread through the yard that she had wanted us fired. And

that was while I was gone on suspension." Kent stated that he had heard about Weitzell's comments through other employees: "[Weitzell] had told her supervisors that, and a supervisor ultimately told a counselor that Kris had—that Kris had said this stuff. And then that counselor called both the other individuals, Jim Davis and Marty Marsh, at home and told them that." *Id.* at 17.

* Davis' deposition testimony wherein he stated that he believed Weitzell was "guilty of slander, spreading it that she wanted us terminated for that. She also tried to discredit me to Cornell Smith, who was supposed to be investigating my discrimination complaint with the Department of Corrections. She also sent Jeff Panknen to my office to, what I considered, threaten me, harass me in the course of my position to find out, you know, what happened with this investigation." *Id.* at 11.

* Marsh's Deposition testimony wherein he noted that he had heard that "Kris ... was very upset with me and then later hear[d] that she wanted me terminated." *Id.* at 66. When asked how he heard that Kris Weitzell wanted him terminated, Marsh stated, "I had heard that from numerous people on the yard. Staff after I came back to work were telling me that. When I was home on suspension, I was called by Claudia Atkinson, and Claudia told me that this had made its way back to her that Kris Weitzell wanted us terminated and that we should keep our heads low when we come back to

**38.** Although the Court has determined that Conn is entitled to immunity from Plaintiffs' defamation claims under the ITCA, it addresses the merits of the slander claim against

Conn in footnote 47, during the discussion of the slander claims against DMACC Defendants.

work. Steve Squires, who's now our personnel director, at the time had heard Janice Berry say that Kris Weitzell wanted us terminated." *Id.*

■■■ Defendants assert that "there is simply no evidence that [Weitzell] said anything defamatory." State Defs.' Br. at 29. Defendants further contend that Weitzell's alleged statements are opinion and, therefore, are not actionable as defamation. The Court need not reach the question of whether Weitzell's statements are opinion [39] because it concurs with Defendants' more fundamental contention that there is no evidence that Weitzell said anything defamatory. There does not appear to be a single piece of non-hearsay evidence supporting the contention that Weitzell made any statements about Plaintiffs, let alone slanderous statements about Plaintiffs. "Inadmissible hearsay evidence alone may not defeat a summary judgment motion." *Firemen's Fund Ins. Co. v. Thien,* 8 F.3d 1307, 1310 (8th Cir.1993). Plaintiffs have not offered an affidavit or testimony from even one individual that was the *actual recipient* of slanderous statements by Weitzell. *See Stueckrath v. Bankers Trust Co.,* No. 06–0803, 2007 WL 258292, at *3 (Iowa Ct.App. Jan. 31, 2007) ("[A]n out-of-court statement that asserts a defendant slandered the plaintiff is hear-say, because it is being offered for the truth of the assertion that the defendant in fact made the statement. Accordingly, an affidavit or deposition testimony that asserts the affiant or witness learned of the allegedly defamatory statement, not through first-hand observation but via a declaration by a third-party, would be admissible only if the third party's out-of-court statement falls within an exception to the hearsay rule."). Moreover, Plaintiffs have offered absolutely no information regarding the actual words of Weitzell's alleged statement or the context in which it was made. Accordingly, Plaintiffs have failed to raise a genuine issue of material fact on the issue of Weitzell's alleged defamation and summary judgment is proper on Plaintiffs' slander claims against her.

4. *State Defendants' request for summary judgment on the intentional interference with contract claims.*

■■■ To state a claim for tortious interference with a contract, Plaintiffs must demonstrate: 1) the plaintiff had a valid contract with a third party; 2) the defendant knew of the contract; 3) the defendant intentionally and improperly interfered with the contract; 4) the interference caused the contracting parties

---

**39.** To determine whether Weitzell's alleged statement is non-actionable as opinion, the Court would be required to evaluate "whether the alleged defamatory statement can reasonably be interpreted as stating actual facts and whether those facts are capable of being proven true or false." *Yates v. Iowa W. Racing Ass'n,* 721 N.W.2d 762, 771 (Iowa 2006). "Under this analysis, 'statements of opinion can be actionable if they imply a provable false fact, or rely upon stated facts that are provably false.'" *Id.* (quoting *Moldea v. New York Times Co.,* 22 F.3d 310, 313 (D.C.Cir. 1994)). "The statement that the plaintiff must prove false is not the literal working of the statement but what a reasonable reader or listener would have understood the author to have said." *Id.* (citing *Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 16–17, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990)). To aid the Court in this analysis, factors to be considered include: 1) "the precision and specificity of the disputed statement"; 2) verifiability of the statement; 3) the "literary context" in which the statement was made; and 4) the "public context" or political arena in which the statement was made. *See Yates,* 721 N.W.2d at 770 (reaffirming the use of these four factors as they were articulated in *Jones v. Palmer Commc'ns, Inc.,* 440 N.W.2d 884, 891 (Iowa 1989)). Given that Plaintiffs have failed to identify the precise words of the alleged defamatory statement, or information about the context in which it was made, evaluation of whether the statement is non-actionable as opinion is not possible.

not to perform the contract with the plaintiff, or made performance more burdensome or expensive; and 5) the amount of the plaintiff's damages. *Burke v. Hawkeye Nat. Life Ins. Co.,* 474 N.W.2d 110, 114 (Iowa 1991); Iowa Civil Jury Inst. 1200.1.

### a. *Weitzell.*

The apparent basis of Plaintiffs' claim of intentional interference with a contract against Weitzell is the same conduct on which Plaintiffs based their claim of slander against her. That is, Plaintiffs contend that Weitzell made it more difficult for each Plaintiff to complete his contract because "the evidence demonstrates that Weitzell spread rumors about the Plaintiffs and told staff members that she wanted the Plaintiffs fired," in violation of the NCF policy concerning confidentiality of investigations and various provisions of the Iowa Code dealing with investigation confidentiality. Pls.' State Br. at 48. As with the defamation claims against Weitzell, however, Plaintiffs have offered absolutely no non-hearsay testimony that would support a conclusion that Weitzell ever made any comment to anybody about the Plaintiffs, let alone that she undertook by way of her comments to make performance of Plaintiffs' employment contracts more burdensome. Accordingly, State Defendants' Motion for Summary Judgment with respect to the intentional interference with contract claims against Weitzell is hereby granted. *See Firemen's Fund Ins. Co.,* 8 F.3d at 1310 ("Inadmissible hearsay evidence alone may not defeat a summary judgment motion.").

### b. *Conn.*

State Defendants argue that Plaintiffs cannot establish a prima facie case of intentional interference with a contract against Conn because Plaintiffs cannot prove the third and fourth elements of the prima face case. With regard to the third

element, requiring Plaintiffs to demonstrate that Conn "intentionally and improperly interfered with the contract," State Defendants contend that Plaintiffs' claims fail because NCF had a legitimate need to investigate the allegations of harassment and to take appropriate actions against Plaintiffs based on the results of that investigation. *See* State Defs.' Br. at 28 (citing *Green v. Racing Assoc. of Cent. Iowa,* 713 N.W.2d 234, 244–45 (Iowa 2006)). Even assuming that Conn is not entitled to immunity under the ITCA, as the Court determined supra, the Court agrees that Plaintiffs' claims of intentional interference with a contract cannot survive State Defendants' summary judgment motion.

To sustain a claim of intentional interference with a contract under Iowa law, Plaintiffs bear the burden of demonstrating that Conn's interference with their contractual relationships was "both intentional *and* improper." *Hill v. Winnebago Indus., Inc.,* 522 N.W.2d 326, 328 (Iowa Ct.App.1994). "Interference with a contract is intentional if the defendant either interferes with the contract on purpose or knows the conduct is substantially certain to interfere with the contract." *Id.* (citing Restatement (Second) of Torts § 766 cmt. j (1979)). In determining whether interference is improper, courts consider:

(a) the nature of the actor's conduct

(b) the actor's motive

(c) the interests of the other with which the actor's conduct interferes,

(d) the interests sought to be advanced by the actor,

(e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,

(f) the proximity or remoteness of the actor's conduct to the interference and

(g) the relations between the parties.

*Toney v. Casey's Gen. Stores, Inc.,* 460 N.W.2d 849, 853 (Iowa 1990) (citing Restatement (Second) of Torts § 767 (1979)).

■ Plaintiffs argue that there is a genuine issue of material fact as to whether Conn's interference with Plaintiffs' contracts was improper because Conn "stated that the Plaintiffs had inappropriate conversations all the time." [40] Pls.' State Br. at 48. Plaintiffs contend that evidence that Conn lied is apparent from the following facts: 1) Conn claimed that Plaintiffs "teased Klubek all the time," but could not remember any of the specific comments; 2) Conn's testimony about Plaintiffs' alleged conduct differs from that of Plaintiffs, who each claim they never made inappropriate comments in front of Klubek; and 3) Conn's testimony differs from Klubek's because Klubek never asserted that Kent was involved in inappropriate conversations. *Id.* at 48–49.

Even assuming that these disparities in information provided to White support a conclusion that Conn lied, they do not support a conclusion that Conn acted with an intent to interfere with Plaintiffs' contracts or that any actual interference with Plaintiffs' contracts was improper. Indeed, Conn provided statements to White pursuant to her obligation to cooperate honestly and fully in investigations at NCF. *See* State Defs.' App. at 51 (White informing Conn that "It's NCF policy you cooperate with any and all investigations. Any statement you make whether it be oral or written shall be truthful in nature."); Pls.' State App. at 215 (IDOC Policy and Standard providing: "Employees must cooperate in an investigation by fully and truthfully answering any job-related questions."). There is no evidence in the record indicating that Conn gave statements to White for any other reason than to comply with her employment obligations, and Plaintiffs' bald speculation as to Conn's motives is insufficient to raise a genuine issue of material fact on the matter. Indeed, Plaintiffs' own speculation about the reasons for Conn's "lies" demonstrates the lack of evidence supporting an inference that Conn acted with an intent to interfere with Plaintiffs' contracts. For instance, Plaintiffs argue: "[a] reasonable jury could conclude that Conn chose to back up Klubek based on their relationship"; "[a] reasonable jury could also conclude that Conn was lying to back up Klubek based on the inconsistencies in their respective statements"; and "[a] reasonable jury could also conclude that Troy White lead Cindy Conn into her statements." [41] *Id.* at 53–55. According to

---

**40.** In the actual statement to which Plaintiffs appear to be referring, Conn did not state that "Plaintiffs had inappropriate conversations all the time." Indeed, the Court can find no such statement by Conn in the record in this case. Rather, Conn told White during the investigation that Plaintiffs "tease[d] Klubek all the time" and made "comments" to her:

Q. Okay. You recall any other comments of a sexual nature being talked about in front of Jill Klubek?

A. They tease her all the time and you know they just make comments.

Q. What do they tease her about?

A. I don't even remember. What would they say. I can't remember what they said but I know that they did make comments to her. I can't remember exactly what they said to her but they did make. [sic].

Q. Were they the people that I've named Jim Davis, Marty Marsh, Joe Kent?

A. Yes.

Pls.' State App. at 54.

**41.** Plaintiffs' arguments in this regard relates to their defamation claims. Plaintiffs, however, allege that precisely the same conduct by Conn supports both the defamation and the intentional interference with contract claims, making consideration of the assertions equally appropriate with regard to Plaintiffs' intentional interference with contract claims.

Plaintiffs, "[t]he reasonable inference from this conduct is that Conn's corroboration of the statements may not be very credible" or that "Conn's statements demonstrate her intent to support Klubek and Reynolds at all costs." *Id.* at 55–56. Even accepting each of these alleged "reasonable inferences" as true, not one of them supports an inference that any interference by Conn with Plaintiffs' employment contracts was improper. *See Berger v. Cas' Feed Store, Inc.*, 543 N.W.2d 597, 599 (Iowa 1996) ("If there is no desire at all to accomplish the interference and it is brought about only as a necessary consequence of the conduct of the actor engaged in for an entirely different purpose, his knowledge of this makes the interference intentional, but the factor or motive carries little weight toward producing any determination that the interference was improper." (quoting Restatement (Second) of Torts § 767 cmt. d)).

With regard to the fourth element of Plaintiffs' prima facie case, State Defendants correctly assert that "there is a total absence of proof that the conduct of the State (or Weitzell and Conn specifically) actually interfered with the contract." State Defs.' Br. at 28. Specifically, State Defendants contend that the evidence makes clear that Defendants remain employed at their jobs and have not lost any pay or other benefits. *Id.* Plaintiffs counter that "[i]f a person makes the performance of a contract more burdensome then that person interfered with the contract under Iowa law." Pls.' State Br. at 49 (citing *Nesler v. Fisher & Co.*, 452 N.W.2d 191, 198–99 (Iowa 1990)). Plaintiffs claim that their contracts were made more burdensome in that: each was suspended for a period of time and actually served his suspension; it took months before Plaintiffs received pay for the time periods of their suspensions; and "the investigation, discipline and rumor mill concerning these allegations made their jobs much more difficult to perform." *Id.*

The Restatement (Second) of Torts provides that a person who intentionally and improperly interferes with the contract between another and a third person, thereby "preventing the other from performing the contract or causing his performance to be more expensive or burdensome, is subject to liability to the other *for the pecuniary loss* resulting to him." Restatement (Second) of Torts § 766A (emphasis added); *see id.* § 766 cmt. t ("The cause of action is for pecuniary loss resulting from the interference."); § 766 (stating that one who intentionally interferes with a contract between another and a third person is responsible "for the pecuniary loss resulting to the other from the failure of the third person to perform the contract"). The Restatement also provides that the loss envisioned by the tort of intentional interference with a contract is as follows:

> If the plaintiff's performance has intentionally been made more burdensome or more expensive by the actor, the cost that he incurs in order to obtain the performance by the third party has increased, and the net benefit from the third person's performance has been correspondingly diminished. This Section covers that loss, too.

Restatement (Second) of Torts § 766A cmt. c. The Iowa Supreme Court has stated that "the losses to which this provision applies are limited to situations where the plaintiff performs a contractual obligation and 'loses all or part of the profits that he would otherwise have obtained, or is subject to a financial loss.'" *Robert's River Rides, Inc. v. Steamboat Dev.*, 520 N.W.2d 294, 304 (Iowa 1994) (quoting Restatement (Second) of Torts § 766A cmt. g), *abrogated on other grounds by Barreca v. Nickolas*, 683 N.W.2d 111 (Iowa 2004).

Accordingly, the Court finds that Plaintiffs allegations that their contracts were "more burdensome" in that their jobs were "more difficult to perform" is insufficient to defeat summary judgment since there is no evidence that any of the Plaintiffs have suffered any financial or pecuniary loss.

### 5. *DMACC Defendants' request for summary judgment on the defamation claims against Klubek and Reynolds.*

DMACC Defendants seek summary judgment on Plaintiffs' allegations of slander against DMACC, Klubek, and Reynolds. Again, Plaintiffs' claims in this regard are poorly defined. It appears that Plaintiffs contend that statements that Reynolds and Klubek made in their respective interviews with White were defamatory.[42] DMACC Defendants argue that their statements enjoy a qualified privilege from defamation claims because they were made in the course of an investigation. *Id.*

▮▮▮ Under Iowa law, defamation consists of the twin torts of libel and slander. *Kiesau v. Bantz*, 686 N.W.2d 164, 174 (Iowa 2004) (citing *Theisen v. Cove-*

*nant Med. Ctr., Inc.*, 636 N.W.2d 74, 83 (Iowa 2001)). More specifically: "Libel in Iowa is the 'malicious publication, expressed either in printing or in writing, or by signs and pictures, tending to injure the reputation of another person or to expose [the person] to public hatred, contempt, or ridicule or to injure [the person] in the maintenance of [the person's] business.' " *Vinson v. Linn–Mar Cmty. Sch. Dist.*, 360 N.W.2d 108, 115 (Iowa 1984) (quoting *Plendl v. Beuttler*, 253 Iowa 259, 111 N.W.2d 669, 670–71 (1961)). Slander's definition is nearly identical to that of libel, however, the injurious words are conveyed by oral statements. *Id.*

▮▮▮ To state a claim for slander, Plaintiffs must establish the following prima facie elements: 1) Defendants made an oral statement about the Plaintiffs; 2) that was false; 3) the statement was made with malice; 4) the statement was communicated to somebody other than Plaintiff, 5) the statement tended to injure the reputation of Plaintiffs, expose Plaintiffs to public hatred, contempt or ridicule, or injured the Plaintiffs in their efforts to maintain their business; 6) the statement caused damage to the Plaintiffs; and 7) the amount of

---

**42.** Plaintiffs also appear to contend that Klubek and Reynolds made defamatory statements to Scheffert–James. Plaintiffs, however, offer absolutely no support for their contention that either Klubek or Reynolds ever named Plaintiffs in their conversations with Scheffert–James or that Plaintiffs ever provided information sufficient enough for Scheffert–James to determine the Plaintiffs' identities. *See Taggart v. Drake Univ.*, 549 N.W.2d 796, 802 (Iowa 1996) (noting the requirement that an alleged defamatory statement must be "of and concerning the plaintiff" to be actionable). Indeed, the only name that even appears in Scheffert–James' e-mail is that of Marsh, but there is no evidence in the record as to where Scheffert–James got his name. Plaintiffs argue that to presume that Scheffert–James got Marsh's name from anyone other than Klubek or Reynolds "defies logic and fails to

give the Plaintiffs the reasonable inference from" evidence in the record. Pls.' DMACC Br. at 15. Plaintiffs' speculation about where Scheffert–James got Marsh's name, however, is insufficient to defeat summary judgment on the issue. In any event, the statements made to Scheffert–James, regardless of whether they were "of and concerning" Plaintiffs, is duplicative of information provided by Klubek and Reynolds in their interviews with White, where Klubek and Reynolds did, in fact, make statements "of and concerning" Plaintiffs. Accordingly, the Court sees no need to delve further into the question of whether any statements to Scheffert–James were defamatory, particularly given the Court's conclusions, *infra*, that DMACC Defendants are protected by a qualified privilege and that Plaintiffs have not provided sufficient evidence of actual malice to overcome the qualified privilege.

damage. Iowa Civil Jury Ins. 2100.3; *see also Vinson,* 360 N.W.2d at 115 ("In actions based on language not libelous per se, all of these elements must be proved before recovery can be had." (citations omitted)).

 If Plaintiffs can demonstrate to the Court that Klubek's and Reynolds' statements are slanderous per se, however, Plaintiffs may proceed "without proof of malice, falsity or damage." *Vinson,* 360 N.W.2d at 115 (citing *Vojak v. Jensen,* 161 N.W.2d 100, 104 (Iowa 1968)). The Iowa Supreme Court long ago identified what type of statement is to be considered defamatory per se:

> The defamatory words to be libelous per se must be of such a nature that the court can presume as matter of law that they will tend to disgrace and degrade the party or hold him up to public hatred, contempt, or ridicule or cause him to be shunned and avoided. The imputation must be one tending to affect a party in a society whose standard of opinion the court can recognize. In many cases, moreover, words charging plaintiff with the commission of acts permissible in law, although they may lack public approval, have been held not to expose plaintiff to hatred, contempt, ridicule, or disgrace in the sense or to the degree required by the law of libel, as, for instance, charging one with setting up the statute of limitations, or the illegality of a contract, as a defense.
>
> To accuse one of being deficient in some quality which the law does not require him as a good citizen to possess is not libelous per se. Mere general abuse and scurrility, however ill natured and vexatious, is no more actionable when written than when spoken, if it does not

convey a degrading charge or imputation.

*Fey v. King,* 194 Iowa 835, 190 N.W. 519, 521 (1922) (citations omitted). Thus, slanderous statements are those that "tend[ ] to injure the reputation of another person or to expose [the person] to public hatred, contempt, or ridicule or to injury [the person] in the maintenance of [the person's] business." *Vinson,* 360 N.W.2d at 115; *see also Schlegel v. Ottumwa Courier,* 585 N.W.2d 217, 221 (Iowa 1998) (noting that defamation is based on the "public policy that individuals should be free to enjoy their reputation unimpaired by false and defamatory attacks" and characterizing statements as defamatory per se when they have "a natural tendency to provoke the plaintiff to wrath or expose him to public hatred, contempt, or ridicule, or to deprive him of the benefit of public confidence or social intercourse)." (citing 50 Am.Jur.2d, *Libel & Slander,* § 2, at 338–39 (1995)). Taken a step further, a statement is slanderous per se if the words "are of such a nature, whether true or not, that it can be presumed as a matter of law that their publication or conveyance will have a libelous or slanderous effect." *Vinson,* 360 N.W.2d at 116 (citing *Haas v. Evening Democrat Co.,* 252 Iowa 517, 107 N.W.2d 444, 447 (1961)). For example, "[a]n attack on the integrity and moral character of a party is [slanderous] per se." *Id.* (citing *Shaw Cleaners & Dyers v. Des Moines Dress Club,* 215 Iowa 1130, 245 N.W. 231, 234 (1932)).

The Restatement (Second) of Torts identifies four categories of slanderous statements that are deemed slanderous per se: [43]

**43.** While Iowa courts have not explicitly adopted the Restatement (Second) of Torts, the categorizations therein are useful and correlate to the relatively sparse Iowa law that does exist on the topic. *See Barreca,* 683 N.W.2d at 116 (noting types of statements that have been found defamatory per se).

One who publishes matter defamatory to another in such manner as to make the publication a slander is subject to liability to the other although no special harm results if the publication imputes to the other:

(a) a criminal offense, as stated in § 571, or

(b) a loathsome disease, as stated in § 572, or

(c) matter incompatible with his business, trade, profession, or office, as stated in § 573, or

(d) serious sexual misconduct, as stated in § 574.

Restatement (Second) of Torts § 570 (1977).

a. *Did Klubek and Reynolds make any statements that are slanderous per se?*

The Court first notes that Plaintiffs claims of defamation wholly fail to identify any specific statements by Klubek or Reynolds that they allege are defamatory. Rather, Plaintiffs make generic and unspecific assertions that Klubek and Reynolds "made statements to third persons concerning the Plaintiffs' alleged participation in sexually harassing conduct at the Newton Correctional Facility." Kent Compl. ¶ 43; Davis Compl. ¶ 34; Marsh Compl. ¶ 34. Absent a clear identification by Plaintiffs of the allegedly defamatory statements, the Court is hard pressed to determine that any particular statement is defamatory. Nonetheless, reviewing the investigation transcripts of Klubek and Reynolds, the Court has identified several statements that it believes are likely to be those that Plaintiffs claim are defamatory.

██ The Court finds that the following statements by Klubek and Reynolds are arguably defamatory per se: [44]

1) Klubek's statement that "Jim Davis" asked her about her bra size.

2) Klubek's statement that Davis and Marsh talked on several occasions about Davis "building a sexual positioning chair."

3) Reynolds' statement that "[s]tories that [Marsh] shared were often times sexually [sic] had sexual information about him and his personal life that I think are inappropriate to share with in the work place."

State Defs.' App. at 47B–50B, 26–29.

While no Iowa case has addressed the issue of whether statements accusing coworkers of engaging in conduct that could arguably be deemed sexual harassment qualify as slander per se, it appears that such statements could, if false, arguably fall within the third category of "slander per se" articulated in the Restatement.[45] That is, if DMACC Defendants made false allegations that Plaintiffs engaged in sexually harassing conduct toward coworkers, such harassment would be incompatible with Plaintiffs' employment, which expressly prohibits such conduct. *See, e.g.,*

**44.** The Court notes that Reynolds never made any reference to Kent or Davis in her interview with White. Accordingly, DMACC Defendants' Motion for Summary Judgment is granted on Kent's and Davis's claims of slander against Reynolds because Reynolds did not make any statements "of and concerning" the noted Plaintiffs. *See Taggart v. Drake Univ.*, 549 N.W.2d at 802 (noting the requirement that an alleged defamatory statement must be "of and concerning the plaintiff" to be actionable); *see also Huegerich v. IBP, Inc.*,

547 N.W.2d 216, 221 (Iowa 1996) (stating that defamatory statements "must be false and demonstrably about the person claiming to be defamed").

**45.** The identified statements could also arguably fall under the fourth Restatement categorization, for allegations of "serious sexual misconduct," though the Court questions whether the allegations of misconduct against the Plaintiffs in this case are severe enough to be considered "serious."

*Shoemaker v. Cmty. Action Org. of Scioto Cty.*, No. 06CA3121, 2007 WL 2070365, at *4 (Ohio Ct.App. July 16, 2007) (finding that defamation per se was shown where the plaintiff "testified that the statements concerning his alleged sexual harassment of a co-worker were false and caused him to lose his job"); *Matlosz v. J.P. Morgan Chase*, No. 03Civ.6235, 2005 WL 2242196, at *11 (S.D.N.Y. Sept. 3, 2005) ("Sexual harassment of co-workers is conduct incompatible with the plaintiff's job and is a wrongdoing on the job."); *Matthew v. Kensington Sq. Apts.*, No. CV020470739S, 2004 WL 1098830, at *2 (Conn.Super.Ct. Apr. 28, 2004) (finding that false oral statements that a supervisor engaged in sexual harassment in the workplace can constitute slander per se); *Scherer v. Rockwell Int'l Corp.*, 766 F.Supp. 593, 606 (N.D.Ill. 1991) ("There is of course little question that if shown to be false, accusations of sexual harassment on the job—so obviously impugning the integrity of Scherer in the discharge of his employment duties and so incapable of innocent construc-

tion—would indeed constitute defamation per se.").

▮▮▮▮ Since Plaintiffs have satisfied their burden to show that Klubek made defamatory per se statements to White about Davis and Marsh, and that Reynolds made defamatory per se statements to White about Marsh,[46] Plaintiffs have satisfied their prima facie burden. This conclusion does not end the inquiry, however. Klubek and Reynolds each assert that they are protected from Plaintiffs' defamation actions by virtue of a qualified privilege.[47]

b. *Are DMACC Defendants entitled to a qualified privilege?*

▮▮▮▮ "Qualified privilege is an affirmative defense which must be pleaded and proved." *Vinson*, 360 N.W.2d at 116. DMACC Defendants properly raised qualified privilege as an affirmative defense to Plaintiffs' Complaint *See* Davis Answer, Clerk's No. 29 ("Any statements . . . were made to persons having a legitimate interest in knowing the content of such state-

---

**46.** As noted, the Court finds that Reynolds did not make any statements at all about Kent or Davis, let alone slanderous per se statements. To the extent that Reynolds' comment about "someone" talking about "sex chairs" with Marsh could otherwise be deemed defamatory per se, there is no evidence in Reynolds' entire statement to White that would support an inference that Reynolds was referencing Davis. Thus, there are no slanderous per se statements in the record by Reynolds about Davis, or by either Reynolds or Klubek about Kent.

**47.** On the merits of the slander claims against Conn, the Court notes that, absent its determination that Conn was acting within the scope of her employment at the time of her alleged tortious statements, it would submit the slander question to a jury with respect to Davis and Marsh. Plaintiffs have identified at least two slanderous per se statements by Conn, to White, of and concerning Davis and Marsh, thus establishing a prima facie case of slander:

1) Conn's statement that "Jim Davis had made one of these sex chairs and they [referencing Davis and Marsh] were talking about it how he made it and different stuff about making this chair."
2) Conn's statement that Klubek heard the conversations about the sex chair and that she told Davis and Marsh so, but "[t]hey just kept, they usually just kept doing it." Unlike Klubek and Reynolds, however, Conn is not entitled to a qualified privilege from the slander claims because State Defendants did not raise qualified privilege as an affirmative defense in their answers to the Plaintiffs' complaints. *See Vinson*, 360 N.W.2d at 116 ("Qualified privilege is an affirmative defense which must be pleaded and proved."); *see* Davis Answer, Clerk's No. 28 (contending only that any statements made by State Defendants "were true, concerned a public employee, and addressed matters of public concern"); Marsh Answer, Clerk's No. 22 (same).

ments and, therefore, the statements made by these defendants were covered by a qualified privilege."); Marsh Answer, Clerk's No. 23 (same). Iowa law regarding privileged communications provides:

> Sometimes one is justified in communicating to others, without liability, defamatory information.... The law recognizes certain situations may arise in which a person, in order to protect his own interests or the interests of others, must make statements about another which are indeed libelous. When this happens, the statement is said to be privileged, which simply means no liability attaches to its publication.

*Vojak,* 161 N.W.2d at 105.

A qualified privilege may be found to exist with respect to otherwise defamatory statements if: 1) the statement was made in good faith; 2) the defendant had an interest to uphold; 3) the scope of the statement was limited to the identified interest; and 4) the statement was published on a proper occasion, in a proper manner, and to proper parties only. *Barreca,* 683 N.W.2d at 118 (quoting *Winckel v. Von Maur, Inc.,* 652 N.W.2d 453, 458 (Iowa 2002)). The question of whether the privilege is available in a particular case is ordinarily one for the Court to determine, rather than a jury. *Vinson,* 360 N.W.2d at 116.

Plaintiffs argue that DMACC Defendants have failed to demonstrate their entitlement to a qualified privilege because there is a genuine issue of material fact as to whether Reynolds and Klubek made their statements in good faith, and because there is a genuine issue of material fact as to whether Klubek had an interest to uphold in the investigation. *See* Pls.' DMACC Br. at 16, 20. Specifically, Plaintiffs argue that "a reasonable jury

could infer from the evidence that Klubek and Reynolds made their statements to [Scheffert–James] in an attempt to cover for Klubek's toxic attitude at the training" and that Klubek and Reynolds then "made the same statements in order to save face in the NCF investigation." Pls.' Resistance Br. at 16. Essentially, Plaintiffs' argument amounts to a contention that Klubek's and Reynolds' statements were false and, thus, could not have been made in good faith. The Court finds this argument unconvincing. There is ample evidence in the record, despite Plaintiffs' protestations to the contrary, from which the Court can conclude that Klubek's and Reynolds' statements were made in good faith, not least among these: Marsh's own statement that he recalled conversations with Davis regarding a "couch" that could be used for "sexual positions" (State Defs.' App. at 11); Davis' own testimony regarding a "general discussion about a particular bench" that he might have referred to as a "love bench" (Pls.' State App. at 96–97); and Doug Talsma's (notably a non-party to the present litigation) testimony that he had heard Davis and Marsh discussing a "sex chair" at work (State Defs.' App. at 34). Moreover, Iowa law provides that a qualified privilege may extend to statements that are untrue, so long as the individuals making the statements do not act with actual malice. *See Thompto v. Coborn's Inc.,* 871 F.Supp. 1097, 1126 (N.D.Iowa 1994) (citing *Vojak,* 161 N.W.2d at 105).

With regard to Plaintiffs assertion that Klubek[48] did not have an interest to uphold, Plaintiffs argue that Klubek's lack of interest stems from the fact that she was not a current employee working at the NCF campus at the time she made state-

---

**48.** Plaintiffs only reference Klubek as lacking an interest to uphold, but the Court's discussion in this regard applies with equal force to an analysis of Reynolds' interests in relaying potentially defamatory material.

ments to White. Pls.' DMACC Br. at 20. The Court again disagrees and finds that Klubek did have an interest to uphold. Courts applying Iowa law have routinely recognized that employers have an interest in investigating the allegedly wrongful acts of employees. *See, e.g., Wright v. Keokuk County Health Ctr.,* 399 F.Supp.2d 938, 954 (S.D.Iowa 2005) (finding that a statement made to an individual having a common interest in investigating employee misconduct was made pursuant to a legitimate interest for purposes of qualified privilege); *Thompto,* 871 F.Supp. at 1126 (employer cooperating with civil rights investigators regarding termination of employee had an interest to uphold). The Restatement (Second) of Torts § 595 recognizes that a qualified privilege protects not only individuals who make statements on the basis of their own "interest to uphold," but also to individuals who provide information "that affects a sufficiently important interest of the recipient [of the information] or a third person." Accordingly, both Klubek and Reynolds were warranted in making statements regarding their personal knowledge of matters under investigation at NCF. Moreover, Klubek and Reynolds only made statements pertinent to the investigation by NCF, and they made those statements only to the officer investigating the matter on behalf of NCF.

### c. Did DMA CC Defendants act with actual malice?

■ For the reasons stated, the Court finds that Klubek and Reynolds had a qualified privilege to communicate the purportedly slanderous statements to White. Nonetheless, "qualified privilege is a defeasible immunity from liability; that is, a qualified privilege may be defeated under certain circumstances." *See Barreca,* 683 N.W.2d at 117. Thus, Plaintiffs' slander claims against Klubek and Reynolds may still proceed if Plaintiffs can raise a genuine issue of material fact regarding wheth-

er Klubek and Reynolds abused the qualified privilege or published defamatory statements about them with "actual malice." *Id.* (citing *Vojak,* 161 N.W.2d at 105). Here, Plaintiffs contend that there is a genuine issue of material fact concerning actual malice because "Plaintiffs' evidence creates a reasonable inference that Klubek and Reynolds' actual motive for making their statements was to protect Klubek and the DMACC program at NCF." Pls.' DMACC Br. at 20. This, Plaintiffs contend, is a "wrongful motive" sufficient to submit the question of actual malice to the jury. *Id.*

■ In *Barreca,* the Iowa Supreme Court rejected the "wrongful motive" definition of actual malice in favor of the actual malice standard of *New York Times v. Sullivan,* which provides that "[a]ctual malice occurs when a statement is made with knowledge that it is false or with reckless disregard for its truth or falsity." *Barreca,* 683 N.W.2d at 120 (citing *Taggart,* 549 N.W.2d 796, 804 (Iowa 1996), citing in turn *New York Times,* 376 U.S. 254, 84 S.Ct. 710 (1964)). The question of whether a defendant acted with actual malice is "ordinarily a matter for the jury." *Id.* at 123. Nonetheless, to support an inference of actual malice, there must be " 'sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication.... [T]he actual malice standard require[s] a high degree of awareness of ... probable falsity.' " *Id.* at 123 (quoting *Caveman Adventures UN, Ltd. v. Press–Citizen Co., Inc.,* 633 N.W.2d 757, 762 (Iowa 2001)).

■ The Court does not believe a genuine issue regarding this high degree of awareness of probable falsity is raised merely by Plaintiffs' unsupported speculation that not one, but two professional individuals made false statements (allegations which were notably confirmed, at

least in part, by statements of the Plaintiffs themselves, as well as by at least one other staff member at NCF that is not involved in the present litigation) against Plaintiffs, and continued to make those assertions during the course of a formal investigation and also under oath at depositions during litigation. Indeed, Plaintiffs have not pointed to one *substantive* piece of evidence in the record that would support the conclusion that either Klubek or Reynolds made their statements to either Scheffert–James or White "with knowledge that [they were] false or with reckless disregard for [their] truth or falsity." *See Kettles v. Petroleum Helicopters, Inc.*, No. 95–10681, 1996 WL 457350, at *4 (5th Cir. July 11, 1996) ("[S]peculations about what the board members must have known or though fall short of the quantum of proof necessary to raise a genuine issue of fact regarding actual malice."); *Graves v. Harris Corp.*, No. 85–1923, 1986 WL 17424, at *2 (4th Cir. Sept. 4, 1986) (finding that actual malice was not shown when evidence failed to rise about the level of "mere speculation"); *LaBruzzo v. Associated Press*, 353 F.Supp. 979, 986 (W.D.Mo. 1973) ("[M]ere suspicion and speculation that the releases were fabricated is insufficient to establish actual malice. There must be evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of the publication."). While the Court acknowledges its obligation to construe every reasonable inference in the light most favorable to Plaintiffs, the mere fact that an inference *can* be drawn does not necessitate a conclusion that the inference drawn is a *reasonable* one. Here, there is absolutely *no* evidence that supports the inference suggested by Plaintiffs. Plaintiffs have not shown that there exists a genuine issue of material *fact* that either Klubek or Reynolds acted with actual malice.[49] Accord-

49. As a natural corollary to the Court's finding that certain statements are slanderous per se, the Court concludes that the following statements by Klubek and Reynolds are *not* slanderous per se:

1) Klubek's statement that Marsh and Kent had a conversation about the "top ten ways you can tell your girlfriend's retarded."

2) Reynolds' statement that "[e]very single time I've come to visit Jill I've overheard conversations that I wish I did not."

3) Reynolds' statement that "an employee and I have no idea who he is" was talking to Marsh about a sex chair and "how well it worked for him and his partner."

In these statements, the information relayed by DMACC Defendants does not have "a natural tendency to provoke the plaintiff[s] to wrath or expose [them] to public hatred, contempt, or ridicule, or to deprive [them] of the benefit of public confidence or social intercourse." The mere fact that Reynolds heard conversations she wished she had not or that Klubek found certain comments or off-color jokes by Plaintiffs offensive does not constitute slander per se because there is nothing about the comments themselves, even viewed in context, that could reasonably be construed as implying that Plaintiffs' behavior was ob-

jectively inappropriate in the workplace. Likewise, Reynolds' statement that "an employee and I have no idea who he is" was talking to Marsh about a sex chair and "how well it worked for him and his partner" is not defamatory per se because it does not identify the individual discussing the "sex chair," nor does it imply in any way that Marsh engaged in or otherwise encouraged the conversation such that his appropriateness on the job could be reasonably questioned.

Since the identified statements do not constitute slander per se, Plaintiffs would be obligated to prove all elements of the traditional prima facie case. The Court finds that Plaintiffs have failed to present sufficient evidence to support the third, fifth, sixth, and seventh elements of the prima facie case. Even assuming, however, that Plaintiffs could satisfy all the elements of the prima facie case, the Court's analysis regarding Klubek's and Reynolds' entitlement to a qualified privilege remains the same, as does the Court's finding that Plaintiffs have failed to raise a *reasonable* inference that either Klubek or Reynolds acted with actual malice sufficient to overcome the qualified privilege. Accordingly, State Defendants' request for summary judgment is

ingly, summary judgment in favor of DMACC Defendants is warranted.

### E. *Kent's Disability Discrimination Claim*

Plaintiff Kent concedes State Defendants' contention that summary judgment on his disability discrimination claim is warranted because the Eleventh Amendment bars the claim in federal court. Accordingly, the State Defendants' Motion for Summary Judgment is granted with respect to Kent's disability discrimination claim.

## V. CONCLUSION

For the reasons stated herein, the Motions for Summary Judgment filed by State Defendants (Clerk's No. 53) and by DMACC Defendants (Clerk's No. 52) are GRANTED. This case is dismissed.

IT IS SO ORDERED.

granted with regard to Klubek's and Reynolds' non-defamatory statements as well.